United States Court of Appeals
Fifth Circuit

**F I L E D**

July 17, 2003

Charles R. Fulbruge III
Clerk

I n the

# United States Court of Appeals
## for the Fifth Circuit

_____

m 02-20331

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

PEDRO CALDERON-PENA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas

_____

Before SMITH and BARKSDALE, Circuit
Judges, and DUPLANTIER,[*] District Judge.

JERRY E. SMITH, Circuit Judge:

Pedro Calderon-Pena was convicted of il-
legal reentry of a removed alien under

_____

[*] District Judge of the Eastern District of
Louisiana, sitting by designation.

8 U.S.C. § 1326. He challenges his
conviction, arguing that the underlying
indictment was invalid because the prior
removal order violated his due process rights.
He also challenges his sentence, contending
that his prior conviction for endangering a
child was not a crime of violence under the
sentencing guidelines, or alternatively that the
use of the 2001 version of the guidelines
violated the *ex post facto* clause of the
Constitution. We affirm the conviction and

sentence.

## I.

In 1999, Calderon-Pena, a citizen of Mexico, was convicted in Texas of two counts of endangering a child and one count of felony criminal mischief for using his car to strike another car that contained his two children; he was sentenced to fifteen months' imprisonment. After his release, the Immigration and Naturalization Service ("INS") initiated removal proceedings, asserting that the child endangerment convictions were "crimes of violence" as defined by 18 U.S.C. § 16 and resulted in a term of imprisonment of at least one year, rendering them "aggravated felonies" under 8 U.S.C. § 1101(a)(43)(F). The immigration judge ("IJ") agreed and found Calderon-Pena deportable on that basis. Calderon-Pena neither appealed the removal order nor pursued administrative remedies; he was deported to Mexico in June 2000.

In January 2001, Calderon-Pena was found in the United States. A federal grand jury indicted him for entering the United States after being deported subsequent to conviction for an aggravated felony pursuant to 8 U.S.C. § 1326(a) and (b)(2). He moved to dismiss the indictment, contending that it was invalid because his removal order violated his right to due process. Specifically, he asserted that he was denied due process because the IJ erroneously had found that the criminal offense that served as the basis for his removal was an aggravated felony and because the IJ had failed to advise him of the availability of discretionary review.

The district court denied the motion. Calderon-Pena waived his right to a jury; all relevant facts were stipulated; and the district court found him guilty as charged.

The presentence report ("PSR") applied the 2001 version of the guidelines and assigned a base offense level of 8, then added a sixteen-level enhancement for being previously deported following a conviction for a felony crime of violence pursuant to U.S.S.G. § 2L1.2(b)(1)(A)(ii). After making a three-point reduction for acceptance of responsibility, the PSR calculated Calderon-Pena's offense level at 21.

Calderon-Pena objected to the calculation, arguing that his child endangerment convictions did not qualify as crimes of violence, rendering the sixteen-level enhancement improper. Alternatively, he urged that the 2000 version of the guidelines should have been applied, because an amendment to § 2L1.2 that became effective after the commission of the offense impermissibly increased his punishment, thereby violating the *ex post facto* clause of the Constitution.

The district court reviewed the indictment from the child endangerment convictions and concluded that those convictions qualified Calderon-Pena for the same sentencing enhancements under either version of the guidelines. It therefore overruled Calderon-Pena's objections, adopted the total offense calculation of the PSR, and sentenced Calderon-Pena to seventy months' imprisonment, a three-year term of supervised release, and a $100 mandatory special assessment.

## II.

Calderon-Pena asserts that the IJ incorrectly determined that his child endangerment convictions were aggravated

felonies, and consequently failed to inform him of discretionary relief from deportation available to those not being deported subsequent to an aggravated felony. The government contends the IJ's failure to advise Calderon-Pena of the availability of discretionary relief did not violate his right to due process, and therefore entry of the removal order did not rise to the level of fundamental unfairness. We review *de novo* a constitutional challenge to an indictment. *United States v. Lopez-Vasquez*, 227 F.3d 476, 481-82 (5th Cir. 2000).

In certain situations, an alien prosecuted under § 1326 may challenge the underlying removal order. *United States v. Mendoza-Lopez*, 481 U.S. 828, 839 (1987).

> Our interpretation of *Mendoza-Lopez* required an alien challenging a prior removal to establish that (1) the removal hearing was fundamentally unfair; (2) the hearing effectively eliminated the right of the alien to challenge the hearing by means of judicial review of the order; and (3) the procedural deficiencies caused the alien actual prejudice.

*United States v. Lopez-Ortiz*, 313 F.3d 225, 229 (5th Cir. 2002), *cert. denied*, 123 S. Ct. 922 (2003). To meet the prejudice prong, an alien must demonstrate a reasonable likelihood that, but for the errors complained of, he would not have been deported. *United States v. Benitez-Villafuerte*, 186 F.3d 651, 658-69 (5th Cir. 1999). These requirements were effectively codified in § 1326(d), which provides:

> In a criminal proceeding under this section, an alien may not challenge the val-

idity of the deportation order described in subsection (a)(1) or subsection (b) of this section unless the alien demonstrates that –

> (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;

> (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and

> (3) the entry of the order was fundamentally unfair.

Eligibility for discretionary relief from a removal order is not "a liberty or property interest warranting due process protection"; thus, an IJ's failure to explain eligibility "does not rise to the level of fundamental unfairness." *Lopez-Ortiz*, 313 F.3d at 231. Considering that the failure to advise an alien of eligibility for discretionary relief is not a liberty interest warranting due process protections, *a violation of an agency regulation requiring* the IJ to inform the alien of eligibility for discretionary relief does not rise to the level of a due process violation, at least under the circumstances presented here.

Calderon-Pena urges that *Lopez-Ortiz* is not dispositive. Citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267-68 (1954), Calderon-Pena contends that he has a due process interest in the INS's following its own regulations in adjudicating his removal, which the IJ violated by failing to advise him of the availability of discretionary relief. In

*Accardi*, an alien attacked the validity of the denial of his application for suspension of deportation, contending that certain conduct by the Attorney General deprived him of the rights guaranteed to him by the applicable immigration statute and regulations. Specifically, the petitioner asserted that the Board of Immigration Appeals ("BIA") had failed to exercise its discretion in denying his application for suspension of deportation, as it was required to do under INS regulations; instead, it denied the application because Accardi was included on a confidential list of people the Attorney General wanted deported. In considering Accardi's application for writ of habeas corpus, the Court concluded that he had sufficiently alleged a due process interest in having the INS follow its own regulations, so the Court remanded to the district court with instruction to determine whether there had, in fact, been a prejudgment and, if so, to order a new administrative hearing. *Id.* at 268.

Calderon-Pena does not cite, nor have we located, any cases applying *Accardi* in the criminal context; all examples of relief granted came either via direct appeal of an administrative ruling or by writ of habeas corpus.[2] In civil proceedings, *Accardi* is applied by ordering a new administrative hearing, and therefore courts do not require a showing of prejudice. Here, we are not empowered to order, nor has Calderon-Pena requested, a new deportation hearing; rather, we may only dismiss the indictment for his subsequent illegal reentry. This is not a remedy contemplated by *Accardi* or its progeny. Irrespective of whether *Accardi* provided a basis for Calderon-Pena to challenge his deportation in a civil proceeding, it is improper to seek its application now in an unrelated criminal proceeding.

Furthermore, the IJ did not, in fact, violate the regulation at issue, which requires that the IJ "shall inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the alien an opportunity to make application during the hearing." 8 C.F.R. § 1240.11(a)(2). Calderon-Pena's allegation that the IJ failed to follow this regulation is predicated on his initial allegation that the IJ's aggravated felony determination was erroneous, because discretionary relief is unavailable to aggravated felons.

Given the IJ's legal determination that the basis of deportation was an aggravated felony, Calderon-Pena's eligibility for discretionary relief was not apparent. Assuming that he should have been eligible for discretionary relief but was not informed, this was caused by an erroneous legal finding, not a failure to follow regulations.[3]

Finally, even were we to accept Calderon-Pena's claim that this case is distinguishable from *Lopez-Ortiz*, that the determination was

---

[2] Conversely, in *United States v. Bricsoe*, 69 F. Supp. 2d 738, 747 (D. V.I. 1999), *aff'd*, 234 F.3d 1266 (3rd Cir. 2000) (table), the district court "decline[d] [defendant's] invitation to extend to criminal prosecutions a doctrine developed for administrative proceedings" and refused to suppress evidence in a criminal case where INS and FBI agents violated agency regulations requiring them to comply with the Vienna Convention by advising a detained foreign national that he had a right to contact his country's consul.

[3] Under Calderon-Pena's reasoning, many, if not most, errors of law by an IJ could be converted into *Accardi* claims, because a given legal determination often will cause an IJ to not apply regulations that he otherwise would have invoked.

4

in error, and that his hearing was unfair, even these showings would not allow him to escape the requirements of § 1326(d); specifically, he still must exhaust "any administrative remedies that may have been available to seek relief against the order." § 1326(d)(1). He had the opportunity to seek administrative review via the BIA and judicial review. He does not allege that the IJ failed to advise him of these rights, and he concedes that he sought no administrative review and waived his right to judicial review.

The IJ's failure to advise Calderon-Pena of available discretionary relief does not excuse his failure to seek relief by the other available avenues. Because he failed to exhaust his administrative remedies, he cannot successfully challenge the validity of the removal order. The district court did not err in denying the motion to dismiss the indictment.

### III.

Calderon-Pena argues that the district court improperly increased his sentence by treating his child endangerment convictions as crimes of violence, or in the alternative that the use of the 2001 version of the guidelines, rather than the 2000 version, increased his sentence and therefore violated the *ex post facto* clause. The district court's interpretation or application of the guidelines is reviewed *de novo*. *United States v. Huerta*, 182 F.3d 361, 364 (5th Cir. 1999). We follow both the guidelines and their accompanying policy statements and give the commentary controlling weight unless it is plainly erroneous or inconsistent with the guidelines. *See United States v. Urias-Escobar*, 281 F.3d 165, 167 (5th Cir), *cert. denied*, 536 U.S. 913 (2002).

### A.

The 2001 guidelines require that "[i]f the defendant previously was deported or unlawfully remained in the United States, after . . . a conviction for a felony that is . . . a crime of violence," the offense level should be increased by sixteen levels. U.S.S.G. § 2L1.2-(b)(1)(A)(ii) (2001). The application notes define crime of violence, in relevant part, as "an offense under federal state, or local law that has as an element the use, attempted use, or threatened use of physical force against the person of another[.]" *Id*. at comment. (n.1(B)-(ii)(I)) (2001) (hereinafter, "the § 2L1.2 definition").

We first address the statement in *United States v. Rayo-Valdez*, 302 F.3d 314, 318 (5th Cir.), *cert. denied*, 123 S. Ct. 694 (2002), that the "§ 2L1.2 definition has eliminated the possibility that a non-enumerated crime risking use of physical force could qualify as a 'crime of violence' . . ." This determination appears to have been predicated on the fact that the § 2L1.2 definition uses "and" to connect the first subparagraph, describing crime of violence as having "as an element the use, attempted use, or threatened use of physical force . . .," and the second paragraph, listing specific crimes, such as murder and manslaughter. This contrasts with U.S.S.G. § 4B1.2, which use the conjunction "or." The word "and" was read to imply that both the first and second part had to be satisfied for a crime to fit the definition.

This determination was "not relevant" to the holding, *id*., so it is *dictum*, and we are not bound by it. *Krim v. Banctexas Group*, 99 F.3d 775, 779 (5th Cir. 1996). At least one panel of this court ignored the statement and analyzed the crime at issue independently under each subparagraph before determining it was not a crime of violence. *See United States v. Rodriguez-Rodriguez*, 323 F.3d 317, 318-19

(5th Cir. 2003) (per curiam).

Although § 4B1.2 uses the phrase "or *is*" to link the two subparagraphs, the § 2L1.2 definition uses the phrase "and *includes*." As we read the § 2L1.2 definition, the second subparagraph adds to, *but does not limit*, the first. Further, because *Rayo-Valdez* held, 302 F.3d at 319, that all the crimes listed in the second subparagraph are crimes of violence, irrespective of whether they appear to satisfy the elements test, its reading renders the first subparagraph unnecessary.

"It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks omitted). As we noted in *Rayo-Valdez*, the guidelines are subject to this and other rules of statutory construction and interpretation. *Rayo-Valdez,* 302 F.3d at 319 (citing *TRW* and *United States v. Vickers*, 891 F.2d 86, 88 (5th Cir. 1989)). We do not interpret § 2L1.2 as requiring that both the first and second subparagraphs be satisfied.

### B.

Calderon-Pena urges that child endangerment cannot qualify as a crime of violence because it does not have as an element the use, attempted use, or threatened use of physical force against the person or property of another. In *Rodriguez-Rodriguez*, 323 F.3d at 318-19, we endorsed a categorical approach to applying the § 2L1.2 definition. Under this analysis, "[w]e need not discuss the facts underlying" the conviction, but instead should "'look only to the fact of conviction and the statutory definition of the prior offense to determine whether a prior conviction qualifies as a predicate offense for sentencing enhancement purposes.'"[4]

The Texas child endangerment statute provides that "A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or omission, engages in conduct that places a child younger than 15 years in imminent danger of death, bodily injury, or physical or mental impairment." TEX. PENAL CODE § 22.041(c). In *United States v. Gracia-Cantu*, 302 F.3d 308, 311 (5th Cir. 2002), we decided that a similar statute, TEX. PENAL CODE § 22.04(a),[5] did not give rise to a crime of violence enhancement under 18 U.S.C. § 16. With regard to § 16(a), which is similar to the

---

[4] *Id*. (quoting *United States v. Vargas-Duran*, 319 F.3d 194, 196 (5th Cir. 2003), *vacated for rehearing en banc*, 2003 U.S. App. LEXIS 13232 (5th Cir. June 26, 2003). Though *Rodriguez-Rodriguez* cited *Vargus-Duran* for this holding, the original source of much of the quotation is *Taylor v. United States*, 495 U.S. 575, 602 (1990) (interpreting the crime of violence definition at 18 U.S.C. § 924(e)).

[5] The statute under which Gracia-Cantu was convicted for injury to a child provides in relevant part:

> (a) A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, elderly individual, or disabled individual: (1) serious bodily injury; (2) serious mental deficiency, impairment, or injury; or (3) bodily injury.

TEX. PENAL CODE § 22.04(a).

6

§ 2L1.2 definition,[6] *Gracia-Cantu* states that the defendant

> persuasively argues that his prior offense does not constitute a crime of violence under 18 U.S.C. § 16(a) because section 22.04(a) of the Texas Penal Code, the statute criminalizing injury to a child, does not require that the perpetrator actually use, attempt to use, or threaten to use physical force against a child. Rather, section 22.04(a) is results-oriented in that the culpable mental state must relate to the result of a defendant's conduct rather than to the conduct itself. The government concedes that, because *the statutory definition* of the offense does not explicitly require the application of force *as an element*, 18 U.S.C. § 16(a) does not apply to Gracia-Cantu's offense of injury to a child. Accordingly, we need

---

[6] The guidelines contain or make reference to several definitions of "crime of violence" that vary from one another in significant ways, and we must be careful in relying on prior cases applying a given definition of that term, to ensure that the provision considered in the precedent case is the same or sufficiently similar to that currently considered. *See United States v. Charles*, 301 F.3d 309, 312 (5th Cir. 2002) (en banc) (overruling cases that "conflated the § 16(b) and [U.S.S.G.] § 4B1.2(a)(2) definitions of crime of violence" because relevant differences in the language of the two provisions meant that "what qualifies as a crime of violence under one does not necessarily qualify under the other"). Title 18 U.S.C. §16(a) defines crime of violence as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another[.]" Sufficient similarity exists to consider precedent interpreting and applying § 16(a) when interpreting the § 2L1.2 definition.

not consider the issue further.

*Id.* at 311-12 (emphasis added and citations omitted).

The salient difference between § 22.04(a) and § 22.041(c) is that in the latter, the perpetrator places a child "in imminent danger" of injury, death, etc., whereas in § 22.04(a) the conduct actually results in the injury, death, etc., of the child. Because the conduct prohibited in § 22.04(a) is identical to or, if anything, more serious than, that prohibited in § 22.041(c), *Gracia-Cantu* appears persuasive.

The government urges that though under *Rodriguez-Rodriguez* we may not look at the specific facts underlying the conviction, we should look to the indictment where a statute contains disjunctive elements. The government distinguishes *Gracia-Cantu* because there it was conceded that § 16(a) did not apply. It also argues that in *Gracia-Cantu* the charging documents were not presented to the court, and therefore we could look only to the statute. Here, it suggests, we have the charging documents and that Calderon-Pena's offenses, as charged, qualify as crimes of violence. Reviewing our precedent, including *Rodriguez-Rodriguez* and *Gracia-Cantu*, we find no case in which we have expressly endorsed or rejected that argument.

The government claims support from *Taylor*, 495 U.S. at 599-602, which it argues allows a court to look at the indictment where the conduct there shown demonstrates that the defendant, in committing a crime, met the definition in the sentencing enhancement. In *Taylor*, the Court addressed "whether a sentencing court in applying [18 U.S.C.] § 924(e) must look only to the statutory

7

definitions of the prior offenses, or whether the court may consider other evidence concerning the defendant's prior crimes." *Id*. at 600. The Court considered § 924(e)(2)(B)(i), which defines a "violent felony" in terms of its "elements" in a manner similar to the § 2L1.2 definition, and under § 924(e)(2)(B)(i), which applies, *inter alia*, if the crime "is burglary." *Id*.

The Court held that "§ 924(e) mandates a formal categorical approach, looking only to the statutory definitions of the prior offenses, and not to the particular facts underlying those convictions." *Id*. It allowed, however, that a sentencing court may "go beyond the mere fact of conviction in a narrow range of cases where a jury was actually required to find all the elements of generic burglary." *Id*. at 602.

> For example, in a State whose burglary statutes include entry of an automobile as well as a building, if the indictment or information and jury instructions show that the defendant was charged only with a burglary of a building, and that the jury necessarily had to find an entry of a building to convict, then the Government should be allowed to use the conviction for enhancement. . . . We therefore hold that an offense constitutes "burglary" for purposes of a § 924(e) sentence enhancement if either its statutory definition substantially corresponds to "generic" burglary, or the charging paper and jury instructions actually required the jury to find all the elements of generic burglary in order to convict the defendant.

*Id*.

As Calderon-Pena points out, this portion

of *Taylor* discusses only § 924(e)(2)(B)(ii). We find no reason, however, why it would not apply to § 924(e)(2)(B)(i) as well. In discussing the categorical approach, the Court stated that "the phrase 'is burglary' in § 924-(e)(2)(B)(ii) most likely refers to *the elements of the statute of conviction*, not to the facts of each defendant's conduct." *Id*. at 600-01 (emphasis added). It understood looking to the indictment or jury instructions to be consistent with a categorical approach. It follows that it would be acceptable to do so when applying § 924(e)(2)(B)(i), and by extension the similarly-worded § 2L1.2 definition.

This is not inconsistent with *Rodriguez-Rodriguez*'s admonition not to consider the facts underlying the conviction. The same language appears inSSindeed, was derived fromSS*Taylor*. In *United States v. Allen*, 282 F.3d 339, 343 (5th Cir. 2002), we read *Taylor*

> as allowing the sentencing court to consider only the statutory definition of the offense, the charging paper and jury instructions. Any different rule raises the possibility of mini-trials to determine the facts underlying a prior offense. Such an "elaborate factfinding process regarding the defendant's prior offenses," is specifically barred by *Taylor*.

(Quoting *Taylor*, 495 U.S. at 601.) We distinguish looking to the indictment to see whether the *facts* there shown required force from looking to the indictment to determine which *elements* in a statute of conviction were satisfied. We therefore conclude that a court may look to the indictment and, if necessary, the jury instructions, *for the limited purpose* of determining which of a series of disjunctive elements a defendant's conviction satisfies.

8

## C.

The indictment states that Calderon-Pena "unlawfully, intentionally and knowingly engage[d] in conduct that placed [his two children] in imminent danger of bodily injury, namely by striking a motor vehicle occupied by the [the children] with the Defendant's motor vehicle." Applying this information to § 22.041(c), we see that Calderon-Pena was convicted of two counts of "intentionally . . . by act . . . engag[ing] in conduct that place[d] a child younger than 15 years in imminent danger of . . . bodily injury[.]" We next must confront whether this statute, as pared down, has as an element the use, attempted use, or threatened use of physical force against the person of another.

Returning to *Gracia-Cantu*, we there stated that § 22.04(a) failed the similar test in § 16(a), because the statute "is results-oriented in that the culpable mental state must relate to the result of a defendant's conduct rather than to the conduct itself." *Gracia-Cantu*, 302 F.3d at 311-12. A broad reading of this statement would seem to preclude the finding of a crime of violence here under § 22.041(c), even with the unnecessary elements removed.

In *United States v. Shelton*, 325 F.3d 553 (5th Cir. 2003), however, we took a narrow reading of *Gracia-Cantu*. There, we considered whether misdemeanor assault has "as an element, the use or attempted use of physical force" so as to satisfy 18 U.S.C. § 921(a)(33)(A). Under § 22.01(a)(1), "[a] person commits an offense if the person . . . intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse. . . ." Referring to the above-quoted passage in *Gracia-Cantu*, we stated that

[i]n *Gracia-Cantu*, the government did

not raise the contention that the element of bodily injury necessarily entailed the use of physical force. Even had such argument been raised, because of the material difference between the injury to a child statute and the instant misdemeanor assault statute, we do not believe it would have made a difference in the analysis or outcome of *Gracia-Cantu*. More to the point, although both Shelton and Gracia-Cantu's predicate convictions do contain the element of bodily injury, the injury to a child statute also proscribes acts of omission perpetrated against a child, elderly individual or disabled individual. By including acts of omission, the injury to a child statute encompasses conduct that, unlike the instant case, does not require the use of physical force by the defendant. Thus, despite the broad "results-oriented" language, because Gracia-Cantu involves a predicate offense that is materially different from that at issue, it is not controlling.

*Shelton*, 325 F.3d at 560-61.

This reading is in apparent tension with the original sweep of *Gracia-Cantu*.[7] If we are not convinced that *Shelton* adequately distinguishes the broad language of *Gracia-Cantu*, we are bound to follow *Gracia-Cantu*.[8]

---

[7] Further, *Shelton* relied heavily on the now-vacated *Vargas-Duran*'s narrowing of *Gracia-Cantu*. *See Shelton*, 325 F.3d at 559-61 (citing *Vargas-Duran*).

[8] *See United States v. Miro*, 29 F.3d 194, 199 n.4 (5th Cir. 1994) ("When faced with conflicting panel opinions, the earlier controls our decision.").

We need not reach the question, however: We addressed whether § 22.01(a) had "as an element the use, attempted use, or threatened use of physical force against the person of another" more than ten years before *Shelton* and found that it did. *United States v. Martinez*, 962 F.2d 1161, 1168-69 (5th Cir. 1992) (considering the definition of "violent felony" at § 924(e)(2)(B)(i)). Therefore, even if *Gracia-Cantu* contradicts the holding of *Shelton*, both are controlled by *Martinez*. We therefore accept *Shelton*'s holding that *Gracia-Cantu*'s "results-oriented" language is applicable only to crimes that can be committed by omission. Because reference to the indictment that resulted in the underlying convictions removes from consideration the "omission" portion of § 22.041(c), the case at bar is distinguishable from *Gracia-Cantu*.

*Shelton* holds that where a predicate offense requires bodily injury, it necessarily includes, as an element, the use of physical force. *Shelton*, 325 F.3d at 561. Though child endangerment requires no bodily injury, it does require that the perpetrator cause someone to be placed in imminent danger of bodily injury. *Shelton*'s reasoning, by extension, would require either attempted use or actual use of force to create the danger. Calderon-Pena's child endangerment convictions therefore have as an element *at least* the attempted use of physical force, if not the use of physical force itself. Accordingly, his predicate offenses satisfy the §2L1.2 definition of crime of violence and support the sentencing enhancement.

D.

We finally turn to Calderon Pena's contention that application of the 2001 Guidelines violates the *ex post facto* clause of the Constitution. The guidelines in effect on the date a defendant is sentenced apply "unless the court determines that 'use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *ex post facto* clause of the United States Constitution,' in which case the court should use the version of the guidelines in effect on the date that the offense of conviction was committed." *United States v. Domino*, 62 F.3d 716, 719-720 (5th Cir. 1995) (quoting U.S.S.G. §1B1.11). Because the court sentenced Calderon-Pena after the effective date of the 2001 guidelines, those guidelines should be used unless doing so results in a harsher sentence than would be given under the 2000 guidelines.

Both the 2000 and 2001 guidelines provide a base offense level of 8. U.S.S.G. § 2L1.2(a) (2000); § 2L1.2(a) (2001). The 2001 version of § 2L1.2 provides a sixteen-level enhancement if the predicate offense is a crime of violence, § 2L1.2(b)(1)(A)(ii) (2001), whereas the 2000 version has no such enhancement. The 2001 version, however, provides only an eight-level enhancement if the predicate offense is an aggravated felony, § 2L1.2(b)(1)(C) (2001), whereas the 2000 version provides a sixteen-level enhancement, § 2L1.2(b)(1)(A) (2000). The only other enhancement under either version is the enhancement for "any other felony," which under both versions results in a four-level enhancement. *See* § 2L1.2(b)(1)(B) (2000); § 2L1.2(b)(1)(D) (2001).

Consequently, there would be an *ex post facto* violation only if Calderon-Pena's endangerment of a child conviction qualifies as a crime of violence under § 2L1.2(b)(1)(A)(ii) (2001) but not as an aggravated felony under § 2L1.2(b)(1)(A) (2000). The 2000 guidelines define "aggravated felony" by reference to

10

8 U.S.C. § 1101(a)(43). Both parties appear to agree that the only provision of this statue that could be relevant is § 1101(a)(43)(F), which includes as an aggravated felony a "crime of violence," defined by reference to 18 U.S.C. § 16.

For obvious reasons, then, Calderon-Pena's child endangerment convictions qualify as aggravated felonies under the 2000 guidelines. For our purposes, § 16(a) is identical to the 2001 guidelines § 2L1.2 definition of crime of violence. Because his crime qualifies under the § 2L1.2 definition, it also qualifies under § 16(a). Therefore, under both the 2000 and 2001 versions, Calderon-Pena would receive a sixteen-level enhancement to his offense level and would receive the same total offense level. Because the relevant portions of the sentencing tables for 2000 and 2001 are the same, his sentencing range is identical under either version. There is no *ex post facto* problem.

The judgment of conviction and sentence is AFFIRMED.