United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 14, 2003**

Charles R. Fulbruge III
Clerk

Revised September 8, 2003

In the

# United States Court of Appeals
## for the Fifth Circuit

––––––––––

m 02-60519

––––––––––

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JOHN L. WILLIAMS, JR.,

Defendant-Appellant.

––––––––––––

Appeal from the United States District Court
for the Southern District of Mississippi

––––––––––––

Before DAVIS, SMITH, and DUHÉ,
    Circuit Judges.

JERRY E. SMITH, Circuit Judge:

John Williams, a deputy sheriff, shot an apprehended, unarmed suspect in the back. A jury convicted him of deprivation of the suspect's rights under color of law, 18 U.S.C. § 242, and discharge of a firearm during and in relation to a crime of violence, 18 U.S.C. § 924(c)(1)(A)(iii). On appeal, Williams primarily argues that the firearm conviction cannot stand because the civil rights count is not a "crime of violence." He also challenges the civil rights conviction on various evidentiary and procedural grounds. Finding no error, we affirm.

## I.

Williams was a deputy sheriff; Adam Hall was on probation for a felony drug conviction. Hall and his wife drove past Williams's marked sheriff's car. Williams followed Hall for several miles before pulling him over, then approached his truck and spoke with him. After some discussion about the status of Hall's driver's license, Williams asked Hall to exit the truck and come to Williams's car. Hall complied. Williams asked Hall whether he had any drugs; Hall said no. Williams then used Hall's social security number to check with the dispatcher about the status of Hall's license.

While they waited for the dispatch report, Williams asked Hall whether he could frisk Hall. Hall consented. According to Hall, Williams found only some loose change in Hall's pocket and a cell phone clipped to his belt. Although Williams claims to have discovered a rock of crack cocaine, he never produced it.

The dispatcher radioed Williams to report that Hall's license was suspended. Hall testified that he did not hear this report. At this point, their accounts sharply diverge. According to Hall, Williams reached for his handcuffs. Hall asked why Williams had stopped him. Williams did not respond, but grabbed Hall's arm. Hall jerked away and walked to his truck, and called out to his wife to ensure she was watching, because he had heard that Williams previously had shot one suspect and planted drugs on another. Hall got in his truck and drove away, but not before Williams had sprayed him with mace. Hall testified that he did not endanger Williams as he drove away.

According to Williams, however, Hall struck him and ran to the truck as soon as Hall heard the dispatch report. Williams approached the truck, repeatedly questioned Hall, and tried to stop him with mace. Williams claims to have barely avoided being run over.

A high-speed and dangerous car chase ensued for about fifteen minutes, beginning, coincidentally, near the home of Claude Billings, chief of police of a nearby town. Billings saw the chase and joined it. After Williams radioed for assistance, William Cooper, the chief deputy sheriff, and Robert Barfield, another deputy sheriff, also joined the chase.

During the chase, Hall turned off the highway where Cooper was parked and standing outside his car. Cooper drew his weapon and ordered Hall to stop. Hall stopped about six feet away from Cooper and asked to speak to Jacob Cartlidge, the sheriff. Hall later testified that he asked for Cartlidge because he trusted Cartlidge but feared Williams. Cooper apparently did not assuage Hall's fears, because Hall again sped away just as Barfield and Williams stopped next to Cooper. All three officers fired on Hall's truck, though Cooper and Barfield later testified that they intended only to disable the truck, not to harm Hall.

They succeeded. A bullet punctured a tire on Hall's truck, forcing him to stop less than a mile away. He immediately ran from the truck into a field. Although Williams testified that Hall stopped, returned to his truck, and grabbed somethingSSimplying that it was a weaponSSBarfield, Cooper, Billings, and Hall testified that Hall did not appear to take anything from his truck and certainly did not return to it.

As Williams fled, Barfield and Williams stopped next to Hall's truck and chased him on foot. Billings drove past them and into the field to cut off Hall. Williams testified that Hall reached into his pockets or his waistband, bent over as if to drop or throw something on the ground, and turned toward Barfield and Williams at least once. Barfield, Billings, and Hall testified that Hall did nothing but run straight from his truck into Billings's position.

Billings exited his car and successfully intercepted Hall. He pointed a rifle at Hall and ordered him to stop. Hall immediately did so and raised his arms above his head with his hands open and empty. Billings later testified that he never intended to shoot Hall, because "the threat level never got that high." Cooper, who had followed Billings into the field, later testified that he saw Hall standing motionless with his arms raised. Cooper therefore deemed the situation "under control" and turned his car around to return to Hall's truck.

Williams, however, asked Barfield for his weapon and then shot Hall in the upper back. Williams admitted that he gave Hall no warning. Billings, Barfield, and Hall testified that Hall was standing motionless with his arms raised and facing Billings when Williams shot Hall. Allen Windom, a civilian who witnessed the foot chase from the highway, confirmed their testimony.

Hall fell to the ground but kept his arms raised. As Billings and Barfield approached Hall, Williams never warned them that Hall might be armed. Billings ordered Hall to lie on the ground, and Hall complied. Barfield reached Hall first and kicked him twice, then handcuffed him and kicked him again. Cooper returned to the scene to pick up Hall. He frisked Hall and found only the loose change

and the cell phone. The officers found neither a weapon nor any drugs on or around Hall or in the truck.

Hall recovered from the gunshot wound and was never charged with a crime. Cartlidge intended to fire Williams, but allowed him to resign instead. Cartlidge testified that when he asked why Williams shot Hall, Williams answered that "he was tired of chasing [Hall] and tired of fooling with [Hall]."

As the basis for the civil rights count, the government alleged that the shooting violated Hall's right not to be deprived of liberty without due process of law and his right to be free from an unreasonable use of force. Barfield agreed to plead guilty and testify against Williams.

The evidence against Williams consisted primarily of the multiple eyewitness accounts. Williams's testimony conflicted with that of Billings, Barfield, Cooper, Windom, Cartlidge, Hall, and Mrs. Hall. Unlike Williams, these witnesses testified that Hall did not return to his truck to grab something, never turned around or bent over during the chase, was standing motionless with his arms above his head when Williams shot him, and generally made no threatening movements.

Williams's testimony also conflicted with his earlier written statements, which did not allege that Hall had bent over or turned around during the foot chase or that Barfield stopped to look for something that Hall allegedly had thrown on the ground. Finally, Williams's testimony conflicted with the limited real evidence, i.e., the absence of a firearm and drugs on or around Williams and in his truck.

Williams was convicted on both counts.

The court sentenced him to eighteen months' imprisonment on the civil rights count and imposed the mandatory minimum of ten years' imprisonment on the firearm count.

## II.

Williams argues that his firearm conviction must be vacated because deprivation of rights under color of law, § 242, is not a "crime of violence" as defined by 18 U.S.C. § 924(c)(3). We review for plain error, because Williams did not object on this ground in the district court. *United States v. Gracia-Cantu*, 302 F.3d 308, 310 (5th Cir. 2002).[1] Because there is no error at all, we affirm the firearm conviction.

Section 924(c)(1) states that "any person who, during and in relation to any crime of violence . . . uses . . . a firearm . . . shall, . . . if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years." 18 U.S.C. § 924(c)(1)(A)(iii). Williams obviously discharged a firearm during and in relation to the deprivation of Hall's rights. He contends, though, that deprivation of rights under color of law, § 242, is not a "crime of violence." Section 924(c)(3) defines "crime of violence," in relevant part, as a felony offense that either "has as an element the use, attempted use, or threatened use of physical force against the person," 18 U.S.C. § 924(c)(3)(A), or "by its nature, involves a substantial risk that physical force against the person . . . may be used in the course of committing the offense," 18 U.S.C. § 924-(c)(3)(B).

We use the so-called categorical approach when applying these definitions to the predicate offense statute. "The proper inquiry is whether a particular defined offense, in the abstract, is a crime of violence[.]" *United States v. Chapa-Garza*, 243 F.3d 921, 924 (5th Cir. 2001) (applying 18 U.S.C. § 16(b)).[2] We do not consider the facts underlying Williams's conviction; his actual conduct is immaterial. Instead, we examine only the statutory text of § 242 to determine whether it satisfies the definition of § 924(c)(3).

That is easier said than done. Section 242 is one long sentence with three clauses separated by two semicolons. The first clause states the three basic elements of any § 242 offense—(1) wilful (2) deprivation of a federal right (3) under color of law—and sets the maximum term of imprisonment at one year.[3] The second clause increases the maximum to ten years if the deprivation results in "bodily injury" or "include[s] the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire." The third clause increases the maximum to life imprisonment or the death penalty if the deprivation results in death or involves certain enumerated serious felonies.

---

[1] "Plain error review is very limited. There must be 'error' that is 'plain' and that affects 'substantial rights,' and even then we have discretion not to correct the error unless it 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Phipps*, 319 F.3d 177, 189 (5th Cir. 2003) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).

[2] Section 924(c)(3) is materially identical to the generic definition in 18 U.S.C. § 16. The only difference is that § 16(a) applies to misdemeanors, whereas § 924(c)(3)(A) applies only to felonies.

[3] To be precise, the first clause identifies other elements—e.g., deprivation on account of race, color, or alienage and deprivation within certain geographic locales—but they are not disputed in this case.

Williams and the government disagree about which clause of § 242 we should examine; Williams argues that we may look only to the first. If he is correct, we must reverse the firearm conviction, because the offense defined by the first clauseSSwilful deprivation of rights under color of lawSSis not a "crime of violence." These facts do not satisfy the definition in § 924(c)(3)(A), because they do not include the use, attempted use, or threatened use of physical force. Nor do they satisfy the definition in § 924(c)(3)(B), because they do not, by their nature, involve a substantial risk of physical force.[4]

The government counters that we also should examine the second clause, because Williams was indicted, convicted, and sentenced pursuant to it. If the government is correct, we must affirm the firearm conviction, because the additional fact in the second clauseSSbodily injury or use of a dangerous weaponSScreates a separate offense that necessarily satisfies either § 924(c)(3)(A) or (B).[5]

Thus, Williams and the government essentially dispute whether § 242 defines three separate offenses or one offense with two sentence enhancements. And with that, they have bought "a ticket to *Apprendi*-land." *Ring v. Arizona*, 536 U.S. 584, 613 (2002) (Scalia, J., concurring). Traditionally, an "offense" was defined by its "elements," i.e., facts necessary to support a conviction for the offense. These "elements" had to be pleaded in the indictment and proved to a jury beyond a reasonable doubt to convict a defendant of an "offense." A "sentence enhancement," on the other hand, could be based on additional "sentencing factors," which a judge could find by a preponderance of the evidence.

The landmark case of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), altered this traditional understanding. Now, "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.* at 476 (quotation marks omitted). After *Apprendi*, terms such as "offense" and "elements," and "sentence enhancement" and "sentencing factors," are "conclusions, not reasons for a conclusion." *United States v. Gonzales*, 327 F.3d 416, 419 (5th Cir. 2003). A court must not carelessly toss these labels around, but instead must examine concretely how all the facts in the statutory text affect the sentence. If a fact increases the statutory maximum, it may be called an "element"; if not, it may be called a "sentencing factor." "What matters, though, is the effect of the fact on the statutory maximum." *Id.* at 420.

The rule of *Apprendi* dictates that the facts in the second clause of § 242SSbodily injury or use of a dangerous weaponSSmust be pleaded in the indictment and proved to the jury beyond a reasonable doubt (as they were

---

[4] We recognize that, as a practical matter, § 242 prosecutions almost always involve an excessive use of force by a law enforcement officer. Yet, there are far too many hypothetical ways wilfully to deprive one of rights under color of law without using forceSSfor example, stealing ballots from a predominantly minority precinct or depriving a criminal defendant of legal counselSSto hold that the first clause of § 242 "by its nature" involves a substantial risk of force.

[5] "[C]ausing bodily injury necessarily includes the element of use of physical force." *United States v. Shelton*, 325 F.3d 553, 555 (5th Cir. 2003). The use, attempted use, or threatened use of a dangerous weapon obviously creates a substantial risk of physical force.

5

here). A defendant convicted of a deprivation of rights under color of law that did not result in bodily injury or involve a dangerous weapon would face a maximum sentence of one year. Add those facts to the mix, however, and the defendant faces a maximum sentence of ten years.

In other words, the facts in the second clause of § 242 are "elements" that define an "offense." Furthermore, this "offense," which includes the "elements" of the first clause, must be distinct from the "offense" defined solely by the "elements" of the first clause, because one can deprive another of rights under color of law without inflicting bodily injury or using a dangerous weapon.

We could not hold otherwise without flagrantly violating the rule of *Apprendi*. Were we to declare that § 242 defines a single "offense" with two sentence enhancements, that holding would mean that the facts in the second and third clauses are not "elements" and thus need not be pleaded in the indictment and proved to the jury beyond a reasonable doubt. It would mean, for example, that Williams could have been sentenced to ten years even if the government had not pleaded and proved bodily injury or use of a dangerous weapon. We reject this flatly unconstitutional result.[6]

_____

[6] *See Jones v. United States*, 526 U.S. 227, 239-52 (1999) (applying the canon of constitutional doubt to hold that the carjacking statute, 18 U.S.C. § 2119, defines three separate offenses, not one offense with two sentence enhancements). Although *Jones* preceded *Apprendi* by a year, the rule of *Apprendi* "was foreshadowed by [the Court's] opinion in *Jones*[.]" *Apprendi*, 530 U.S. at 476. In fact, the rule of *Apprendi* is a quotation from *Jones*. *See id.* (quoting *Jones*, 526 U.S. at 243

Our decision in *United States v. Harris*, 293 F.3d 863 (5th Cir.), *cert. denied*, 123 S. Ct. 395 (2002), also demonstrates that § 242 defines three separate offenses. In *Harris*, the defendant appealed the sufficiency of the evidence for his § 242 conviction. He was indicted and convicted pursuant to the second clause of § 242. *Id.* at 868-69. On appeal, he argued that he had not caused the victim's injuries. *Id.* at 869-70. We noted that "*the particular crime* charged in the indictment required 'bodily injury' *or* 'the use, attempted use, or threatened use of a dangerous weapon.'" *Id.* at 870 (first emphasis added). In the next sentence, we explained that "[t]he trial court's instructions to the jury correctly described *this element of the crime*." *Id.* (emphasis added). We concluded that there was sufficient evidence that the defendant used a "dangerous weapon," hence we did not need to consider whether he caused bodily injury. *Id.*

*Harris* inescapably treats the second clause of § 242 as a separate offense. The defendant faced a single § 242 count. If § 242 did not define multiple offenses, we would not have identified the "particular crime charged" because the defendant could have faced only the basic § 242 offense. Furthermore, we explicitly called the facts in the second clause an "element" of the crime. To reiterate, this characterization means that those facts must be pleaded and proved, which in turn means that they define a separate "offense." Indeed, under *Harris* they *must* be "elements" of a separate "offense," because one can violate (the first clause of) § 242 without inflicting bodily injury or using a dangerous weapon.

_____

[6](...continued)
n.6).

6

In *Apprendi*-land, therefore, § 242 defines three separate offenses, not one offense with two sentence enhancements.[7] From his sentence and indictment,[8] we know that Williams was indicted for and convicted of the offense defined in the second clause of § 242. As we explained earlier, this offense is unquestionably a "crime of violence" under § 924(c)(3). We therefore affirm his firearm conviction.

## III.

Williams argues that we must reverse his civil rights conviction because of two evidentiary errors and alleged prosecutorial misconduct. We review evidentiary rulings and allegations of prosecutorial misconduct for abuse of discretion and harmless error. *United States v. Coleman*, 78 F.3d 154, 156 (5th Cir. 1996) (evidentiary rulings); *United States v. Wyly*, 193 F.3d 289, 298-99 (5th Cir. 1999) (prosecutorial misconduct).

### A.

#### 1.

Williams contends that the court violated FED. R. EVID. 704 by allowing Barfield, Cooper, and Billings to testify that the shooting was not reasonable. He did not, however, object on this basis in the district court,[9] so we review this argument under the even more deferential plain error standard. *United States v. Green*, 324 F.3d 375, 381 (5th Cir.), *petition for cert. filed*, 71 U.S.L.W. 3791 (June 6, 2003) (No. 02-1811).

The prosecutor questioned Barfield, Billings, and Cooper extensively about the circumstances of the shooting. To sum up their testimony, the prosecutor asked each officer whether he thought the shooting was reasonable. More importantly, she asked them to answer based on their training and experience as law enforcement officers. Each

---

[7] Section 242 effectively defines the basic offense of deprivation of rights under color of law and two aggravated offenses, which one might call a deprivation resulting in bodily injury or involving a dangerous weapon and a deprivation resulting in death or involving certain serious felonies. *Cf. United States v. Matthews*, 312 F.3d 652, 655 (5th Cir. 2002) (applying this reasoning to the similar statute of 18 U.S.C. § 2119), *cert. denied*, 123 S. Ct. 1604 (2003).

[8] Our use of the indictment does not violate the categorical approach. Where a single statute contains multiple offenses, some of which are a "crime of violence" and others which are not, we may examine the indictment to determine the offense of which the defendant was convicted. *Taylor v. United States*, 495 U.S. 575, 602 (1990). We use the indictment not to determine whether the defendant's particular conduct actually involved violence, but merely to identify the statutory offense of which the defendant was convicted. Once we identify that offense, we then examine its statutory text without reference to the defendant's particular conduct, to decide whether the offense is a "crime of violence." *See United States v. Calderon-Pena*, 2003 U.S. App. LEXIS 14348, at *20-*21 (5th Cir. July 27, 2003).

[9] Williams did not object at all when the prosecutor posed the question to Barfield. When the prosecutor asked Cooper, Williams objected that the question called for speculation since Cooper did not see the shooting. Williams voiced only a general objection when the prosecutor asked Billings. The court soon thereafter asked counsel, in a *sua sponte* sidebar, whether it had committed error under rule 701 by allowing Billings to give expert testimony without first qualifying him as an expert. Williams's counsel reiterated his objection to the question, but the context demonstrates that he was objecting to an unqualified lay witness's giving expert testimony in violation of Rule 701, not to testimony in violation of rule 704.

answered that the shooting was unreasonable.

Williams argues that, for two reasons, these answers were impermissible opinion testimony. First, he contends that the officers' testimony violated rule 704(b), which prohibits experts from testifying that a criminal defendant "did or did not have the mental state or condition constituting an element of the crime." FED. R. EVID. 704(b). Although the officers did not testify as experts, Williams argues that their opinion testimony about the reasonableness of the shooting should be treated as expert testimony because it was "based on . . . specialized knowledge within the scope of [FED. R. EVID.] 702." FED. R. EVID. 701. Second, Williams contends that the officers' testimony violated rule 704(a), which prohibits any witness, expert or lay, from testifying to a legal conclusion. *United States v. Izydore*, 167 F.3d 213, 218 (5th Cir. 1999) (citing FED. R. EVID. 704(a)).

Even if we treat the officers' testimony about the reasonableness of the shooting as expert testimony, that testimony would not violate rule 704(b), because the officers did not testify to Williams's mental state. To be sure, an element of any § 242 offense is deprivation of a federal right, in this case an unreasonable use of force under the Fourth Amendment or Due Process Clause. The reasonableness of a use of force, though, is no more a mental state than is action under color of law or bodily injury. The requisite mental state of any § 242 offense is wilfulness, about which the officers did not testify.[10] Thus, the testimony did not

violate rule 704(b).

On the other hand, the court erred under rule 704(a) by allowing the officers' testimony about the reasonableness of the shooting. Rule 704(a) "does not allow a witness to give legal conclusions." *Izydore*, 167 F.3d at 218. *See* 3 STEPHEN A. SALTZBURG, MICHAEL M. MARTIN & DANIEL J. CAPRA, FEDERAL RULES OF EVIDENCE MANUAL § 704.02[4] (Matthew Bender 2002). Reasonableness under the Fourth Amendment or Due Process Clause is a legal conclusion. *See, e.g.*, *United States v. Chavez*, 281 F.3d 479, 483 (5th Cir. 2002). Nevertheless, we are confident that this error did not affect the outcome of Williams's trial.

The evidence against Williams was overwhelming.[11] The officers' brief opinions followed their damning factual testimony about the circumstances of the shooting. Windom, Mrs. Hall, and Hall corroborated the officers' factual testimony without improperly opining on reasonableness. No one, on the

---

[10] This court's precedent confirms that rule 704(b) applies to traditional mental states or conditions such as intent, knowledge, and insanity, not substantive determinations such as reasonableness
(continued...)

---

[10](...continued)
under the Fourth Amendment or the Due Process Clause. *See, e.g.*, *United States v. Gutierrez-Farias*, 294 F.3d 657, 662-63 (5th Cir. 2002) (testimony regarding knowledge), *cert. denied*, 123 S. Ct. 869 (2003); *United States v. Levine*, 80 F.3d 129, 134-35 (5th Cir. 1996) (testimony regarding insanity); *United States v. Dotson*, 817 F.2d 1127, 1132 (5th Cir. 1987) (testimony regarding wilfulness), *modified*, 821 F.2d 1034 (5th Cir. 1987).

[11] We have affirmed convictions based on the strength of the evidence as a whole, notwithstanding opinion testimony admitted in violation of rule 704. *See, e.g.*, *Gutierrez-Farias*, 294 F.3d at 663 (holding that error was harmless); *Izydore*, 167 F.3d at 218 (holding that error, if any, was harmless).

other hand, corroborated Williams's testimony, which itself contradicted his prior written statements. Moreover, even if the jury uncritically accepted the officers' opinion testimony, this did not necessitate a guilty verdict, because the reasonableness of the shooting was not the ultimate issue; the jury still could have acquitted Williams, for example, by finding that he did not act wilfully. *Izydore*, 167 F.3d at 218.

2.

Williams contends that the court improperly admitted character evidence in violation of FED. R. EVID. 404(b). The government wanted Hall to testify that he fled from Williams because he knew that Williams previously had shot another suspect.[12] Hall objected. The government explained that this testimony would help the jury to understand why Hall, an unsympathetic victim, fled from Williams. The court ruled that Hall could testify to his knowledge of the shooting but not to the surrounding circumstances, including whether Williams had shot the suspect in the back or whether the shooting was justified. Thus, Hall testified that he feared Williams "because I knowed he had shot a guy in Hollandale." Immediately after he left the stand, the court gave the jury a thorough limiting instruction on this testimony.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes . . . ." FED. R. EVID. 404(b). "To determine whether 'other acts' evidence was erroneously admitted, first we must

determine whether the evidence was intrinsic or extrinsic." *Coleman*, 78 F.3d at 156. *See* 1 STEPHEN A. SALTZBURG, MICHAEL M. MARTIN & DANIEL J. CAPRA, FEDERAL RULES OF EVIDENCE MANUAL § 404.02[11] (Matthew Bender 2002).

Extrinsic evidence must satisfy rule 404(b), whereas "[i]ntrinsic evidence does not implicate Rule 404(b)." *Id.* Evidence of another act is "intrinsic" if it and "evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged." *Id.* (quoting *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990)). Under this definition, Hall's testimony about an old and unrelated shooting is plainly extrinsic evidence subject to rule 404(b).

In *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) (en banc), we established a two-step test for the admissibility of extrinsic evidence under rule 404(b). "First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character." *Id.* at 911. The government argues that Hall's knowledge of Williams's prior shooting was critical to Hall's state of mind. Williams disparages this theory, asking how *the victim's* state of mind could be relevant to *the defendant's* offenses.

Though a victim's state of mind indeed rarely matters, in this case it somewhat helped the government disprove Williams's main defense. The jury had to determine whether Williams acted reasonably when he shot Hall. This judgment turned on a credibility assessment: Was Williams telling the truth when he testified that Hall made several threatening movements before Williams shot

---

[12] Hall alleged that Williams shot the suspect in the back. Williams admitted to having shot a suspect before, but denied shooting him in the back.

him, or were the other witnesses telling the truth when they denied such movements? If Hall feared that Williams might shoot him, the government argues, then Hall would avoid anything that might provoke Williams to shoot.

For example, Hall would not rifle around his truck or reach into his pants as if to grab a weapon. Although the conflicting eyewitness testimony easily disproved Williams's defense, we cannot say that Hall's fear of being shot and the basis of that fear did not have "any tendency" to disprove Williams's defense. FED. R. EVID. 401.

The second step of the *Beechum* test is that "the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of [R]ule 403." *Beechum*, 582 F.2d at 911. Hall's testimony did not unduly prejudice Williams; indeed, it probably did not prejudice him at all. Hall merely testified that Williams had previously shot a suspect, not that the suspect was a drug dealer or that Williams shot him in the back. Without that context, the testimony hardly impugns Williams's character. Law enforcement officers must shoot suspects sometimes, and the jury just as easily could have believed that the prior shooting was justified and that Hall's fear was unfounded. Moreover, the limiting instruction "further mitigated any potential prejudicial effect." *United States v. Gonzalez*, 328 F.3d 755, 760 n.2 (5th Cir. 2003).

As for the other requirements of rule 403, Williams does not seriously contend that this single line of minor testimony could have confused the issues, misled the jury, wasted time, or resulted in cumulative evidence. FED. R. EVID. 403. The court did not abuse its discretion by permitting the testimony under rule 404(b).[13]

## B.

Williams further argues that the prosecutor engaged in misconduct by forcing Williams, through a series of rhetorical questions, to call the other witnesses liars. "In reviewing an assertion of prosecutorial misconduct, this [c]ourt employs a two-step analysis." *United States v. Wise*, 221 F.3d 140, 152 (5th Cir. 2000), *cert. denied*, 532 U.S. 959 (2001). We initially must determine whether "the prosecutor made an improper remark." *Id.* The government concedes that the prosecutor acted improperly by asking Williams about the other witnesses' veracity. *United States v. Thomas*, 246 F.3d 438, 439 n.1 (5th Cir. 2001).

"[T]he second step is to evaluate whether the remark affected the substantial rights of the defendant[ ]." *Wise*, 221 F.3d at 152. When applying this standard, we "consider three fac-

---

[13] Williams also contends the court abused its discretion by allowing Hall to testify that he feared Williams might plant drugs on him. To justify this fear, Hall proposed to testify that he had heard that Williams had planted drugs on other suspects. The court ruled that Hall could state his fear but could not testify to any hearsay allegations of Williams's planting drugs on suspects. Thus, Hall testified only that he feared Williams might "throw down drugs on [me] when [I was] stopped." Because this testimony refers only to Hall's unsupported belief, not any other act by Williams, it cannot violate rule 404(b).

Finally, Williams avers that we must reverse because the court did not make on-the-record findings for its *Beechum* analysis. Williams, however, never requested such findings. *United States v. Robinson*, 700 F.2d 205, 213 (5th Cir. 1983).

tors: (1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction." *Wyly*, 193 F.3d at 299 (quotation marks omitted). All three factors lead us to conclude that the improper questioning did not affect Williams's substantial rights.

First, the magnitude of the prejudicial effect, weighed in context, *id.*, was surely small. The questioning lasted just moments at the end of a long and devastating cross-examination. The prosecutor had skillfully and properly led Williams to contradict directly the testimony of all other witnesses. Thus, Williams already had called these witnesses liars, albeit implicitly. "Pointing out the obvious most likely scored the government, at most, rhetorical points. We cannot say that these few largely rhetorical questions from the prosecutor affected at all the outcome of the trial." *United States v. Sullivan*, 85 F.3d 743, 750 (1st Cir. 1996).

Second, the court properly instructed the jury on its role as fact-finder. As with *Wise*, 221 F.3d at 153, and *Wyly*, 193 F.3d at 299, there is no indication, much less an "overwhelming probability," that the jury could not follow that instruction. Moreover, the instruction immediately preceded the jury's deliberations, whereas the improper questioning occurred earlier in the trial. *Wyly*, 193 F.3d at 300.

Third, "the evidence of guilt was overwhelming." *Id.* Williams does not dispute that he shot an unarmed man in the back. His testimony contradicted his prior written statements. Six eyewitnesses (Billings, Barfield, Windom, Cooper, Mrs. Hall, and Hall) expressly contradicted Williams's

fantastic testimony that Hall made any threatening movements. Four eyewitnesses (Billings, Barfield, Windom, and Hall) testified that Williams shot Hall while Hall was facing the other direction and standing motionless with his arms raised. Cartlidge testified that Williams admitted to shooting Hall out of frustration or anger. Williams gave no "reason for the jury to disbelieve th[is] substantial incriminating testimony." *United States v. Boyd*, 54 F.3d 868, 872 (D.C. Cir. 1995).

Tellingly, Williams offers no examples of a court of appeals' reversing a conviction because a prosecutor improperly questioned a defendant about another witness's veracity. This court has disapproved this tactic at least twice, but did not reverse for that reason in either case. *Thomas*, 246 F.3d at 439 n.1; *United States v. Johnston*, 127 F.3d 380, 389 (5th Cir. 1997). The First and District of Columbia Circuits have affirmed convictions despite identical misconduct, which they dismissed as merely stating the obvious or as minimally important. *Sullivan*, 85 F.3d at 751; *Boyd*, 54 F.3d at 872 (plain error review). Even in Williams's main cases, the Second and Ninth Circuits disapproved of this tactic, but reversed the conviction because of other, more serious errors. *United States v. Sanchez*, 176 F.3d 1214, 1220, 1225 (9th Cir. 1999); *United States v. Richter*, 826 F.2d 206, 208 (2d Cir. 1987). The questioning, though inappropriate, is not reversible error.[14]

---

[14] Williams also asserts that in closing argument, the prosecutor improperly vouched for Barfield's credibility. The prosecutor did not intimate personal knowledge of Barfield's credibility, but merely reminded the jury that Barfield began cooperating with the government before receiving a plea agreement and asked it to infer, altogether rea-
(continued...)

## IV.

Finally, Williams argues that the prosecutor violated his due process rights during rebuttal closing arguments by stating that Barfield would be sentenced to at least five months' imprisonment under his plea agreement. We review *de novo* an alleged due process violation, *United States v. Runyan*, 290 F.3d 223, 245 (5th Cir.), *cert. denied*, 123 S. Ct. 137 (2002), and conclude that the comments did not violate Williams's due process rights.

In closing argument, Williams's counsel hammered away at Barfield's testimony. He contended that Barfield lied to obtain a sweetheart plea agreement. In her rebuttal closing, the prosecutor countered this argument in several ways. First, she noted that Barfield was only one of three officers who testified against Williams. Next, she reminded the jury that Barfield revealed to the government the events to which he later testified *before* he received a plea agreement. Finally, the prosecutor disagreed that Barfield's agreement was generous. Specifically, she stated, "He's going to jail, ladies and gentleman. He is going to jail. There is no chance for him not to go to jail . . . ."

Williams's counsel objected here, but the court overruled the objection. The prosecutor then stated, "[Barfield] told you that what his understanding of what that plea agreement was and what his deal was, was that he can go to

jail still for up to two years, absolutely will go for at least five months. Somewhere in between there. It will be up to the court. What a deal." The court, however, later sentenced Barfield to six months' home confinement.

"When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the] general rule of *Brady* [*v. Maryland*, 373 U.S. 83 (1963)]." *United States v. Scott*, 48 F.3d 1389, 1395 (5th Cir. 1995) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)). This rule applies to "any understanding or agreement as to a future prosecution." *Giglio*, 405 U.S. at 155. A *Giglio* violation usually occurs when a cooperating witness denies having a plea agreement and the prosecutor fails to correct the misstatement. *See, e.g.*, *United States v. Mason*, 293 F.3d 826, 828 (5th Cir. 2002). A prosecutor violates *Giglio*, however, if he denies the existence or misrepresents the terms of a plea agreement. *Armour v. Salisbury*, 492 F.2d 1032, 1037 (6th Cir. 1974).

To prove a due process violation, Williams must establish that the prosecutor knowingly made a false and material statement during the rebuttal closing. *Cf. Mason*, 293 F.3d at 828 (explaining standard for knowing use of false testimony). Williams has not satisfied this standard, because the prosecutor did not misrepresent Barfield's plea agreement. Rather, she merely explained its terms, which call for five months' to two years' imprisonment. Even if she somewhat overzealously asserted that "[t]here is no chance for him not to go to jail" and "[he] absolutely will go for at least five months," these statements must be read in context, where the prosecutor also explained that the court ultimately would decide Bar-

---

(...continued)

sonably, that the agreement did not alter Barfield's testimony. This kind of request for a favorable inference from record evidence is not improper vouching, especially because Williams had attacked Barfield's credibility. *United States v. Munoz*, 150 F.3d 401, 414-15 (5th Cir. 1998).

field's sentence.

Moreover, Barfield did not get away scot-free; home confinement, like imprisonment, is a kind of confinement, and Barfield received a sentence within the agreed range. This situation therefore differs in kind, not merely in degree, from cases in which the prosecutor and cooperating witness conceal from the jury the existence of the plea agreement altogether. *See Giglio*, 405 U.S. at 151-53; *Mason*, 293 F.3d at 828-29; *United States v. Bigeleisen*, 625 F.2d 203, 208 (8th Cir. 1980).

We further note that Barfield's sentence was not material to the jury's assessment of his credibility. Williams and the government disputed the effect of the plea agreement on Barfield's veracity. To assess Barfield's credibility, the jury needed to know the range of punishment that Barfield expected under the plea agreement at the time of his testimony, not his actual, later punishment. *See Scott*, 48 F.3d at 1394-95. Barfield testified that he expected imprisonment for a term of five months to two years, exactly what the plea agreement specified. Thus, the jury had the essential fact needed to assess the effect of the plea agreement on Barfield's credibility.

Finally, the prosecutor's initial point in her opening rebuttal must not be forgotten: Barfield was only one of several witnesses against Williams. On appeal, Williams asserts that Barfield's testimony was critical because he was the closest eyewitness. Maybe so, but Williams does little to undermine the testimony of Billings, Cooper, and Windom. Moreover, Williams forgets the testimony of Cartlidge, Hall, and Mrs. Hall, not to mention his own contradictory written statements.

AFFIRMED.

13