GARWOOD, Circuit Judge:
Defendant-Appellant Charles Harris (Harris) appeals his conviction under 18 U.S.C. § 242. The United States of America (the Government) cross-appeals the sentence imposed by the trial court. Harris was convicted in a jury trial of using excessive force during the course of an arrest. The sentencing court imposed a sentence including imprisonment for thirteen months, departing downward from the sentencing range established by the United States Sentencing Guidelines (the Guidelines). We affirm the conviction and the district court’s decision to depart downward. This opinion addresses those two issues. For the reasons stated in the separate opinion of Judge Wiener, Judge Vance concurring, a majority of this panel concludes that the extent of the departure has not been adequately justified, and accordingly this court vacates and remands the sentence.
Facts and Proceedings Below
On May 9, 1998, Harris, Chief of Police for the Town of Golden, Mississippi, arrested Geraldo Lopez (Lopez) for public drunkenness. Harris was indicted for using excessive force during the course of the arrest by “willfully” striking Lopez “with a police baton, a dangerous weapon, ... resulting in bodily injury” to Lopez, in violation of 18 U.S.C. § 242.[2] On February 15, 2000, after a two-day trial, the jury rendered a guilty verdict.
On the evening of the arrest, Lopez, a Mexican citizen, was attending a party at a residence in Golden. Harris was the only Golden officer on duty that night. Responding to a complaint from neighbors, Harris went to the house where the party was in progress and requested that the partygoers quiet down. They said that they would and Harris left. Shortly thereafter, the party got loud again and Harris returned to ask the partygoers to quiet down a second time. After his second visit, Harris placed a radio call to the Tishomingo County Sheriffs Department requesting backup.[3] Four Sheriffs Department officers arrived in response to Harris’s call for assistance. The noise continued. Harris and three of the officers — Officers Flynt, Trimm, and Stacy-approached the house and warned the revelers that arrests would be made if the party continued to be too noisy. The par- *868 tygoers again promised to be quiet. Harris and the other officers left the house and went to a parking lot about a block away. About five minutes later, the officers heard the noise from the party resume and they returned to the house and began making arrests.
Harris arrested Lopez. The precise sequence of events from that point onward are somewhat in dispute. The testimony indicates that Lopez initially submitted to being handcuffed behind his back and to being placed in the back seat of Harris’s patrol car.[4] The patrol car had a plexiglass barrier, reinforced with metal brackets and wire mesh, that separated the back seat from the front seat passenger compartment. Harris closed the car door, left Lopez alone in the back seat, and began walking back toward the house. In his trial testimony, Lopez conceded that he was drunk and that he began to thrash about in the back seat. Officers Flynt and Stacy testified that Lopez began kicking at the windows of the car. The trial testimony further established that, at this point, Harris returned to the car and opened the door near where Lopez’s feet were. Lopez continued to kick at Harris. Harris told Lopez to stop kicking him and Harris struck Lopez in the shins with a police baton at least once.
After Harris closed the car door again, Lopez resumed thrashing about the car and started banging his head against the plexiglass divider. Harris opened the car door again and, according to the testimony, again began to strike Lopez with the baton. Gary Pounders, a neighbor and the only witness called by the defense, partially corroborated the testimony of Government witnesses.[5] Officer Flynt testified that Harris landed blows on Lopez’s face and head. Lopez testified that Harris hit him on the left temple. FBI agent Sum-merlin testified that Harris, during a noncustodial interview regarding the incident, had admitted hitting Lopez in the head. Officer Stacy testified that he stopped Harris from hitting Lopez because Harris “had lost his composure as a law enforcement officer.” Officer Trimm testified that he approached the car and attempted to reach in and stop Lopez from banging his head. Trimm testified that he never saw Harris strike Lopez but that Lopez had blood on his head when Trimm approached the car.. Lopez kicked Trimm in the groin and Trimm sprayed Lopez with pepper spray in an attempt to subdue him. Lopez continued to thrash violently. Finally, a woman who had attended the party was able to calm Lopez down.
It was determined that Lopez should be taken to the hospital because he was bleeding from the head. Ambulance operator and police officer Mike Kemp arrived on the scene. Officer Kemp testified that Harris told him that he had “knocked the s-h-i-t” out of Lopez. Kemp refused to transport Lopez in his ambulance unless an officer accompanied Lopez. Harris opted to drive Lopez to the hospital himself.
Registered Nurse Cummings was an emergency room nurse who treated Lopez at the hospital. Cummings testified that Lopez presented with two separate injuries on his head, a laceration and a hema-toma. She further testified that she could not say whether or not these injuries could have been caused by a blunt instrument like a police baton. X-rays and a CT scan of Lopez’s head were negative. His lacer *869 ation was sutured, he was given a tetanus shot and was discharged just under two hours after his arrival at the hospital. There is no evidence he subsequently sought any further medical attention.
The district court held a sentencing hearing on June 14, 2000. The Presen-tence Investigation Report calculated the total offense level (including enhancements) to be 29 and a criminal history category of I. Under the Guidelines, these figures provided a sentencing range of 87 to 108 months’ imprisonment. The sentencing court found that Lopez’s wrongful conduct had" significantly contributed to provoking the offense behavior and that a downward departure was warranted pursuant to U.S.S.G. § 5K2.10. The court sentenced Harris to a term of thirteen months in prison, two years’ supervised release and a $5,000 fine.
Harris , appeals contending that the evidence is insufficient to support his conviction. The Government cross-appeals, contending that the district court erred in determining that downward departure was justified and that even if departure were warranted the extent thereof here granted was unreasonably large.
Discussion
I. Standard of Review
We review the jury’s finding of guilt under a standard that is highly deferential to the verdict:
“The standard of review for determining whether there was sufficient evidence to convict a defendant is whether the evidence, when reviewed in the light most favorable to the government with all reasonable inferences and credibility choices made in support of a conviction, allows a rational fact finder to find every element of the offense beyond a reasonable doubt. The evidence is viewed in the light most favorable to the verdict, accepting all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict.” United States v. Asibor, 109 F.3d 1023, 1030 (5th Cir.1997) (internal citations omitted).
We review the sentencing court’s decision to depart downward from the Guidelines under a deferential abuse of discretion standard. Koon v. United States, 518 U.S. 81, 116 S.Ct. 2035, 2046, 135 L.Ed.2d 392 (1996). The district court’s interpretation of the Guidelines is a question of law that this court reviews de novo. United States v. Clayton, 172 F.3d 347, 353 (5th Cir.1999). The sentencing court’s factual findings are reviewed for clear error and this court gives due deference to the sentencing court’s application of the Guidelines to the facts. 18 U.S.C. § 3742(e)(4).
II. Sufficiency of the Evidence
Harris argues that the evidence was insufficient for the jury to find him guilty of using excessive force in violation of 18 U.S.C. § 242. Both here and in the trial court, the defense’s argument has centered on the evidence pertaining to Lopez’s injuries. Harris contends that the Government did not prove that the laceration or the hematoma was caused by Harris’s -striking Lopez with a baton rather than by Lopez’s striking his own head against parts of the car.' It is not entirely clear whether this is an argument that the Government did not prove that Harris actually hit Lopez in the head- or an argument that the Government did not prove that Harris caused any sufficient injury to Lopez. In either case, the argument is ultimately unavailing and we .affirm the jury’s finding of guilt.
Two witnesses, Lopez and Officer Flynt, testified that they observed Harris strike Lopez in the head. A third witness, Agent Summerlin, testified that Harris admitted striking Lopez in the head. These pieces *870 of direct evidence were corroborated by the circumstantial evidence provided by Officers Trimm and Stacy; Trimm and Stacy each testified that' they observed Harris moving about in the car and then observed Lopez bleeding from the head. Drawing all inferences from this evidence in the light most favorable to the verdict, a reasonable jury could find that the Government had proven beyond a reasonable doubt that Harris struck Lopez in the head with the baton.
To find that Harris used excessive force in violation of Lopez’s rights under the Fourth Amendment, it was not necessary for the jury to find that Lopez had suffered “significant injury.” United States v. Sanchez, 74 F.3d 562, 565 (5th Cir.1996). Officers Flynt and Trimm both testified that, in their experience, hitting Lopez in the head with the baton would have been excessive under the circumstances. The defense’s own witness, Pounders, expressed the same opinion based on his military training in the use of restraining force. Officer Stacy testified that Harris could have better controlled Lopez by waiting until the other officers came over to help Harris restrain him. However, the particular crime .charged in the indictment required “bodily injury” or “the use, attempted use, or threatened use of a dangerous weapon.” 18 U.S.C. § 242 (providing for a maximum term of imprisonment of ten years if either of these factors is present). The trial court’s instructions to the jury correctly described this element of the crime. It is undisputed that Harris used a police baton during the incident and the jury could rationally find that this was a “dangerous weapon.” See Koon, 116 S.Ct. at 2048 (noting that the district court had regarded a police baton as a “dangerous weapon” for purposes of applying the Sentencing Guidelines); ef. United States v. Estrada-Fernandez, 150 F.3d 491, 497 (5th Cir.1998) (determination whether an object is a “dangerous weapon” is a jury question and relevant factors include the circumstances under which the object is used); United States v. Park, 988 F.2d 107, 109-110 (11th Cir.), cert. denied, 510 U.S. 882, 114 S.Ct. 226, 126 L.Ed.2d 182 (1993) (metal pipe swung in a threatening manner found to be a “dangerous weapon.”).
Because there was sufficient evidence that Harris used a “dangerous weapon” in committing the assault, we can affirm this conviction under section 242 without deciding whether the Government proved that Harris had caused “bodily injury” to Lopez or the scope of “bodily injury” as used in section 242.[6] The jury *871 was presented with sufficient evidence to conclude that Harris struck Lopez in the head with a dangerous weapon, the police baton, and that this action constituted excessive force under the circumstances. These elements are sufficient to sustain Harris’s conviction under Section 242.
III. The Decision to Depart Downward The Government argues that the district court’s downward departure from the Sentencing Guidelines was unauthorized and that, if a departure were authorized, a departure down to thirteen months’ imprisonment was unreasonably large.
We review a district court’s departure from the range established by the Guidelines for abuse of discretion. Koon v. United States, 518 U.S. 81, 116 S.Ct. 2035, 2046-47, 135 L.Ed.2d 392 (1996). The district court’s decision is accorded substantial deference because it is a fact intensive assessment and the district court’s findings of fact are reviewed for clear error. Id. However, the district court’s interpretation of the Guidelines is a question of law, reviewed de novo; a district court abuses its discretion by definition when it makes an error of law. Id. at 2047. Determining whether a factor is permissible to take into account when considering a departure is one of these questions of law. Id. A district court abuses its discretion if it departs on the basis of legally unacceptable reasons or if the degree of the departure is unreasonable. United States v. Nevels, 160 F.3d 226, 230 (5th Cir.1998).
We now address the district court’s decision that a downward departure was warranted. We distinguish this inquiry from the separate question of whether the extent of the departure was reasonable. In reviewing the decision to depart downward, the judges of this panel are not called upon to decide whether, had we presided at trial and sentencing, we would have drawn the same inferences from the evidence or made the same factual findings as did the district court. All we are called upon to decide is whether that court’s view of the evidence and its findings are clearly erroneous. Nor are we called upon to decide whether, accepting the district court’s findings, we would have exercised our discretion to depart from the guideline range. All we are called upon to decide is whether the district court’s decision to depart was on a legally invalid basis and whether that decision was an abuse of the court’s discretion.
The Government picks snippets from the court’s comments during the sentencing hearing to argue that the district court’s departure decision was influenced by possibly improper considerations. After reviewing the transcript from the sentencing hearing and the court’s written Statement of Reasons for departing, we are satisfied that the district court made it clear that it relied on U.S. Sentencing Guidelines Manual § 5K2.10 in deciding to depart downward.[7] Therefore, we will ap *872 ply the review standard described above to the district court’s interpretation and application of Section 5K2.10.
Section 5K2.10 is a policy statement explaining that a downward departure is permissible “[i]f the victim’s wrongful conduct contributed significantly to provoking the offense behavior.” U.S. Sentencing Guidelines Manual § 5K2.10 (1998). The Government argues that Section 5K2.10 contemplates only victim misconduct that poses actual, or reasonably perceived, physical danger to the defendant. We think this interpretation goes too far afield of the plain language of Section 5K2.10 to be tenable. If the Sentencing Commission had intended such a narrow construction, it could have framed Section 5K2.10 in terms related to the doctrines of sudden emergency, imminent peril, self-defense or the like, rather than in the broader terms of “wrongful conduct .... provoking the offense behavior.” U.S.S.G. § 5K2.10; cf. Blankenship v. United States, 159 F.3d 336, 339 (8th Cir.1998), cert. denied, 525 U.S. 1090,119 S.Ct. 844, 142 L.Ed.2d 699 (1999) (“[A] defendant need not prove the elements of a justification defense in order to obtain a downward departure on the basis of the victim’s wrongful conduct....”). In Koon, the Supreme Court sustained the district court’s section 5K2.10 downward departure despite its unassailed finding that at the time of the offense behavior the victim “was no longer resisting arrest. He posed no objective threat, and the defendants had no reasonable perception of danger.” Id. at 2048. Moreover, “the offense behavior” is an important phrase; it signifies that there is a relationship between the type of offense behavior and the type of *873 victim misconduct that would “contribute! ] significantly to provoking” it. Victim misconduct posing a physical danger to the defendant may be necessary to significantly provoke some types of offense behavior, but less serious victim misconduct may be sufficient to provoke less violent offense behavior. Section 5K2.10 itself contains the following explanation: “There may ... be unusual circumstances in which substantial victim misconduct would warrant a reduced penalty in the case of a non-violent offense. For example, an extended course of provocation and harassment might lead a defendant to steal or destroy property in retaliation.” We note that this passage was cited as instructive by the Supreme Court in Koon. Id. 116 S.Ct. at 2049. There is no necessary connection between offense behavior consisting of a property crime and a requirement that the victim’s misconduct pose a physical danger to the defendant. Nor do “provocation and harassment” necessarily imply any physical danger.
Section 5K2.10 does list the following factors that a court should consider “[i]n deciding the extent of a sentence reduction” (emphasis added):
“(a) the size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant;
(b) the persistence of the victim’s conduct and any efforts by the defendant to prevent confrontation;
(c) the danger reasonably perceived by the defendant, including the victim’s reputation for violence;
(d) the danger actually presented to the defendant by the victim; and
(e) any other relevant conduct by the victim that substantially contributed to the danger presented.”
Other than (b), these factors do relate to physical danger and the Government references them in support of its interpretation of Section 5K2.10. In response, we note first that these are factors to be considered in determining the extent of a downward departure rather than whether there should be a downward departure, which is the question we address here. We next observe that these factors will not always be relevant to every type of offense behavior, including some offenses expressly contemplated by Section 5K2.10. As discussed above, Section 5K2.10 explicitly refers to property crimes as a type of offense behavior that a victim might provoke by his misconduct. The misconduct plainly need not be of a kind which poses a threat of physical injury to the defendant. In many cases where the offense behavior is theft or vandalism, such factors as the size and strength of the victim will have little or no relevance. Taken as a whole, Section 5K2.10 evinces a concern that the offense behavior be not excessively disproportionate to the provocation. See Blankenship, 159 F.3d at 339.
The cases from our sister circuits that the Government cites in support of its interpretation are in line with our construction. The defendant in United States v. Paster, 173 F.3d 206 (3d Cir.1999), had been convicted of murdering his unfaithful wife, and the Court of Appeals affirmed the district court’s refusal to depart under Section 5K2.10. The defendant in United States v. Shortt, 919 F.2d 1325 (8th Cir.1990), had been convicted of making and possessing a pipe bomb, with which he had apparently been planning to kill his wife’s lover, and the Court of Appeals, pre-Koon, reversed the Section 5K2.10 departure. In these cases the offense behavior involved the intentional or planned destruction of human life; those courts, understandably, regarded the threat of physical danger as a necessary component for the victim’s misconduct to sufficiently mitigate this type of offense conduct. See Paster, 173 F.3d at 212 (“Paster’s response was gross *874 ly disproportionate to any provocation.”); Shortt, 919 F.2d at 1328 (“While the District Court is surely correct that ‘there’s hardly any greater provocation than to have someone having an affair with your spouse[,]’ that is not the end of the matter. The further question remains: provocation for what?” (internal citation omitted)).
The offense behavior here involved Harris’s striking Lopez in the head with the baton.[8] The district court’s commentary during the sentencing hearing demonstrates that it was engaging in the proportionality analysis necessary to apply Section 5K2.10. The court’s factual findings that Harris hit Lopez “back-handed”, using his forearm, and that Lopez suffered little physical damage are adequately supported by the testimony and are not clearly erroneous.[9] It was appropriate for the court to take these factors into account when doing the proportionality analysis; they are relevant to determining the severity of the blows Harris struck. A certain degree of victim misconduct may be sufficient to provoke less severe blows but insufficient to provoke more severe blows. In Koon, the victim, Rodney King, was beaten severely, but he had also engaged in severe misconduct and the sentencing court did not abuse its discretion in departing downward pursuant to Section 5K2.10. Koon, 116 S.Ct. at 2049-50. In the instant case, it was necessary for the district court to evaluate the severity of Harris’s offense behavior in order to determine whether Lopez’s misconduct significantly contributed to provoking that behavior.
Koon further teaches that the district court did not abuse its discretion by taking into account the entire course of Lopez’s misconduct. In that case, the district court applied Section 5K2.10 after finding that, although the victim was no longer resisting arrest or posing any danger at the time the defendants’ actions crossed the line to unlawful force, the victim’s course of misconduct, which included driving while intoxicated, fleeing the police, and initially resisting arrest, was provocative. Koon, 116 S.Ct. at 2048. In this case there was a similarly extended course of provocative misconduct.[10] Lopez admits that he became intoxicated during the course of his participation in a raucous party. Harris visited the house where the party was in progress three times — twice *875 by himself, once accompanied by other officers — to warn the partygoers to be quiet before returning the fourth time to begin making arrests.[11] Every eyewitness, including Lopez, agrees that Lopez persisted in thrashing around violently in the car, threatening to damage both the vehicle and himself. Lopez kicked Harris and Officer Trimm when they attempted to subdue him and he persisted even after Trimm sprayed him with pepper spray.[12] Although there was testimony that Lopez initially submitted to being arrested and handcuffed, Lopez pleaded guilty to resisting arrest and the district court was entitled to take this fact into account in evaluating Lopez’s misconduct.
The district court also took note of Harris’s unblemished record as a police officer. A defendant’s “[e]mployment record is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range.” U.S.S.G. § 5H1.5 (emphasis added). But, in this case, Harris’s record was relevant to whether Lopez provoked the offense behavior. A record of excessive force complaints might indicate that an officer is inclined to use unlawful force absent any provocation; an unblemished record may indicate the opposite inclination. The district court did not abuse its discretion by taking this factor into account. Cf Koon, 116 S.Ct. at 2046-47 (district court’s special vantage point informs its refined assessment of whether the case before it is unusual).
In light of the factors described above, the district court found that this case was different from the typical case contemplated by the Sentencing Guidelines, in which the victim had done nothing to provoke an officer’s use of unlawful force. The Supreme Court has explained why such a finding was not an abuse of the district court’s discretion:
“The [Koon] Court of Appeals misinterpreted the heartland of § 2H1.4 by concentrating on whether King’s misconduct made this an unusual case of excessive force. If § 2H1.4 covered punishment only for excessive force cases, it might well be a close question whether victim misconduct of this kind would be sufficient to take the case out of the heartland. Section 2H1.4 is not so designed, however. It incorporates the Guideline for the underlying of *876 fense, here § 2A2.2 for aggravated assault, and thus creates a Guideline range and a heartland for aggravated assault committed under color of law. As the District Court was correct to point out, the same Guideline range applies both to a Government official who assaults a citizen without provocation as well as instances like this where what begins as legitimate force becomes excessive. The District Court did not abuse its discretion in differentiating between the classes of cases, nor did it do so in concluding that unprovoked assaults constitute the relevant heartland. Victim misconduct is an encouraged ground for departure. A district court, without question, would have had discretion to conclude that victim misconduct could take an aggravated assault case outside the heartland of § 2A2.2.” Koon, 116 S.Ct. at 2049-50.
In sum, the record does not establish that the district court based its decision that a downward departure was warranted on impermissible factors or that it abused its discretion in deciding to depart downward pursuant to Section 5K2.10.
IV. Extent of Departure
For the reasons stated in the separate opinion of Judge Wiener, concurred in by Judge Vance, a majority of the panel concludes that the extent of the departure has not been adequately justified on the record as reasonable, and that accordingly the sentence must be vacated and the cause remanded for resentencing.
Conclusion
Because there was sufficient evidence to convict Harris, we AFFIRM the conviction. Because the district court did not err in law or abuse its discretion in deciding to depart downward, we AFFIRM the district court’s decision to depart. However, for the reasons stated in the separate opinion by Judge Wiener, concurred in by Judge Vance, this court VACATES the sentence imposed by the district court and REMANDS the case for resentencing.
AFFIRMED IN PART; VACATED AND REMANDED IN PART.

. 18 U.S.C. § 242 provides:
"Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.”

.Golden is in Tishomingo County and it was regular practice for Harris to request assistance from the Sheriff's Department when he needed it.

. Lopez eventually pleaded guilty to a charge of resisting arrest.

. It appears from Pounders's testimony that he only witnessed the second of the two occasions when Harris opened the car door. Pounders testified that he saw Harris strike Lopez once on the legs and that he never saw Harris strike Lopez on the head.

. Arguably, the trial testimony gives equal or nearly equal circumstantial support to the theory that Lopez's head laceration and he-matoma were caused by Lopez’s banging his head against surfaces in the car rather than by Harris's striking Lopez. Cf. United States v. Lopez, 74 F.3d 575, 577 (5th Cir.1996) (conviction must be reversed if evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence.”); United States v. Reveles, 190 F.3d 678, 686 (5th Cir.1999) (same). We also note, however, that the instructions to the jury, as to which Harris has raised no complaint on appeal, state in relevant part:
"The Government must also prove that the defendant's acts either resulted in some bodily injury or involved the use of a dangerous weapon. In order to prove that the defendant's acts resulted in bodily injury, the Government need not prove that the defendant intended to cause bodily injury to the victim, but only to prove that bodily injuiy, no matter how slight, did result from the defendant’s alleged assault on Gerardo [sic] Lopez. Bodily injuiy would include a cut or bruise or physical pain." (emphasis added).
Under this definition, the evidence was clearly sufficient to show bodily injury. We are satisfied that if there were any error in this aspect of the instructions (a matter we do not decide) it was not clear or plain error. See United States v. Myers, 972 F.2d 1566, 1572 (11th Cir.1992), cert. denied, 507 U.S. 1017, 113 *871 S.Ct. 1813, 123 L.Ed.2d 445 (1993) (approving instructions that "bodily injury” under section 242 "means any injury to the body, no matter how temporary ... also includes physical pain as well as any ... abrasion”).

. The district court’s written Statement of Reasons reads, in relevant part:
"The victim in the instant case was not compliant with arresting officers, including the defendant. It is the Court's opinion the victim in the instant case was extremely persistent in his wrongful conduct which significantly provoked the defendant's excessive use of force against the victim. Due to the aforementioned factors, it is the Court’s opinion the victim’s wrongful conduct contributed significantly to provoking the offense behavior; therefore, a downward departure is made pursuant to U.S.S.G. § 5K2.10.”
The district court’s oral remarks at sentencing included the following:
"... pursuant to section 5(k)2.10 the Court finds that the victim’s wrongful conduct *872 contributed significantly to provoking the offense behavior, and under that section, the sentence may be reduced below the guideline range to reflect the nature and circumstances of the offense.
In this particular case, the record shows that Mr. Harris, on two occasions, after receiving calls from neighbors in the community asking for him to come up and restore order to the neighborhood as a result of this alleged — of this victim and his friends’ loud and raucous parties at night and after going and asking the victim and his friends on two occasions to be quiet, they refused to follow his directions. So then he called for other persons, other law enforcement officers, to come in and help him.
Mr. Harris and the other law enforcement officers went to the house where the victim and his friends were drinking and playing loud music late at night out on the carport and asked them to be quiet and they refused again. So that was the third trip that had been made to this house asking for quiet.
After they refused to be quiet on the third trip, the officers went back again the fourth time and arrested the victim and he was detained by the defendant and was placed in the back of the patrol car.
It was obvious from the testimony that the victim was intoxicated, was very intoxicated; that he was irate and he started trying to kick out the inside of the car, kicking at the back seat, the windows and the seats. The testimony revealed that when this was going on, Mr. Harris reached in and hit him on the shins trying to stop that, and then after that happened, the door was shut, the victim started slamming his head against the plexiglass divider between the front seat and the back seat.
One officer had gone in and sprayed him with pepper spray, and pepper spray in a . closed car did not stop the victim from banging around in the back of the car. All attempts to stop this tearing up the back of the car were unsuccessful, and then Mr. Harris did, at that time, commit the crime with which he stands convicted, he hit him in the head with a police baton .... it was a backhand blow that did — was a result of disruptive behavior by the victim. It was obviously provoked.”
The Presentence Report states, inter alia, "it appears the victim’s continued disruptive behavior contributed significantly to provoking the offense behavior.”

. The Government’s position throughout has consistently been that it was the blow or blows to Lopez’s head that crossed the line from a lawful use of force to an unlawful one. The Government does not dispute that Lopez was lawfully arrested. When examining the officers and Pounders at trial, the prosecutors elicited testimony to the effect that striking Lopez in the head was an unreasonable use of force under the circumstances, although striking Lopez in the shins or legs probably was not. Additionally, the Government has laid great stress on the laceration and hematoma present on Lopez’s head and has not identified physical injuries on any other part of Lopez’s body as being relevant to the prosecution.

. The district court stated at sentencing "he hit him back-handed. He didn't raise the baton over his head and come down on him, but he reached into the car and hit him with it back-handed. Back-handed. Because as I understand, that would be using your forearm” and "there was not very much damage done to this victim at all.”

.We do not, in any way, equate the severity of Lopez's misconduct with that of the victim in Koon. We reiterate that Section 5K2.10 is concerned with proportionality. Rodney King’s misconduct was severe and created a serious risk of injury to others. His attackers beat him severely and repeatedly, leaving him with multiple fractures and numerous contusions. Koon, 116 S.Ct. at 2041. In the instant case, Lopez’s misconduct was far less severe and so was his victimization. The district court, in a finding supported by the medical evidence, inferred that Lopez was not severely injured by Harris's blows.

. There is no indication in the record — and there was no finding by the district court— that Lopez, as compared to other attendees, was particularly culpable for the disruptive nature of the party. Lopez was not on trial here and this sentencing hearing could have no effect on his rights. Part of the focus in the Section 5K2.10 inquiry must be on the defendant’s state of mind. By the plain language of the section, the defendant must have actually been provoked. From the fact that Harris had been required to visit the house three times asking for quiet, the district court could reasonably infer that Harris was in an agitated state of mind, and more susceptible to provocation, by the time he arrested Lopez.

. It appears from the testimony that Trimm did not spray Lopez and Lopez did not kick Trimm until after Harris had hit Lopez in the head. If this was the case, then it cannot be said that Lopez's kicking Trimm provoked Harris's bad act. However, the testimony did not make the precise sequence of events entirely clear. Trimm testified that he never saw Harris hit Lopez but that Lopez was bleeding from the head before Trimm sprayed him. Pounders testified that Trimm stepped in between Lopez and Harris after Harris had struck one blow toward Lopez’s feet and while Lopez was still kicking in Harris's direction. Officer Stacy testified that he never saw Trimm spray Lopez, but that, when Stacy intervened to stop Harris’s assault on Lopez, Stacy could smell that Lopez had already been "maced.” Even if the pepper spray and Lopez’s kicking Trimm did not occur until after Harris struck Lopez in the head, Lopez’s persistence after being sprayed with pepper spray may be indicative of how violently out of control he was during the course of the incident.