United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 7, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 03-41024

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

GAMALIEL DE LIRA-VILLAREAL,

Defendant-Appellant.

---

Appeal from the United States District Court
For the Southern District of Texas
(03-CR-60)

---

Before GARWOOD, WIENER, and DeMOSS, Circuit Judges.

PER CURIAM:[*]

Defendant-Appellant De Lira-Villareal was convicted of two counts of transporting illegal aliens within the United States in contravention of 8 U.S.C. § 1324(a)(1)(A)(ii). On appeal, De Lira-Villareal's sole argument is that there was insufficient evidence supporting his convictions.

---

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

## BACKGROUND AND PROCEDURAL HISTORY

On the evening of February 21, 2003, Border Patrol Agent Jose Jalomos, an 11-year veteran, was performing traffic observation duties along State Highway 359 southwest of Benavides, Texas. During his patrol, Agent Jalomos observed four vehicles approaching his position on State Highway 359 and pulled his patrol vehicle over to the side of the road to wait for the vehicles to pass by his location. Only two of the vehicles eventually reached Agent Jalomos, the first of which was a white Ford crew cab pickup truck. As the pickup made its way past Agent Jalomos, he observed through his night-vision goggles that there were two people in the front of the cab and four others sitting in the back seat of the cab, with an additional person lying across the laps of the four back seat passengers. Agent Jalomos turned his vehicle around and pursued the white pickup. The pickup passed through the town of Benavides without stopping and continued northeast along State Highway 359. After passing through Benavides, Agent Jalomos noticed that the positions of the passengers in the back seat had changed — once seated upright, all were now crouched down to the point where Agent Jalomos "could barely see the heads over the rear back window."

Agent Jalomos subsequently activated his vehicle's overhead emergency lights and pulled over the pickup. Upon approaching the pickup, Agent Jalomos observed a total of nine people inside the vehicle: the driver (De Lira-Villareal), a passenger in the front

2

seat, a person lying on the front passenger floorboard, four people seated in the back seat, one person lying across the laps of the back seat passengers, and one person lying on the floorboard of the back seat. Agent Jalomos performed an immigration inspection of the pickup's occupants and determined that, with the exception of De Lira-Villareal, all were undocumented illegal aliens from Mexico. De Lira-Villareal was found to be a resident alien who lived in San Antonio. All nine individuals were arrested and transported to the Border Patrol station located approximately 22 miles away in Freer, Texas.

After being arrested, De Lira-Villareal was interviewed by Agent Jalomos at the Freer Border Patrol station where he indicated that he had been visiting a friend in Laredo and was returning to his home in San Antonio. De Lira-Villareal added that he was initially traveling from Laredo to Mission, Texas, to visit his mother, but, after realizing along the way that he did not have enough gas to make the trip, changed his mind and headed to San Antonio. When asked by Agent Jalomos about the passengers in the pickup, De Lira-Villareal responded that he had stopped in the city of Realitos, located 13 miles southwest of Benavides, to get some diesel fuel when the passengers approached him about getting a ride. When asked where De Lira-Villareal was taking the passengers, he stated that "he was just giving them a ride up ahead."

Agent Jalomos also interviewed two of the aliens who were

3

detained as material witnesses. The material witnesses, Juan Bravo-Ramirez and Augustin Machuca-Rocha, both admitted to authorities that they had entered the United States illegally. While the detained aliens provided varying accounts as to how they entered the United States, both stated that they were eventually guided through the brush to a highway whereupon their guide deserted the group.[1] The aliens then attempted to flag down a ride. Both deposed aliens said they had no conversation with De Lira-Villareal other than to get a ride. Machuca-Rocha claimed that De Lira-Villareal told the group he was taking them to a town further down the road, while Bravo-Ramirez told authorities that De Lira-Villareal "was taking [him] to a city north of the location where [he was] stopped."

A grand jury indicted De Lira-Villareal on March 12, 2003, charging him with two counts of transporting illegal aliens within the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii).[2] De Lira-Villareal pleaded not guilty to both counts. On May 7, 2003, after a one-day trial, a jury convicted De Lira-Villareal on both counts of the indictment. On July 18, 2003, the district court sentenced De Lira-Villareal to two concurrent terms of twelve

---

[1] Both aliens indicated that they had made arrangements to pay their smugglers once they arrived at their respective destinations, but that neither had yet paid.

[2] The two counts in the indictment were for the transportation of two separate illegal aliens: the alien in Count 1 was Bravo-Ramirez, and the alien in Count 2 was Machuca-Rocha.

months and one day for each violation of § 1324(a)(1)(A)(ii), concurrent two-year terms of supervised release, and a $100 special assessment. De Lira-Villareal timely filed the instant appeal.

**STANDARD OF REVIEW**

The standard for reviewing the sufficiency of the evidence is whether the evidence, when reviewed in the light most favorable to the government with all reasonable inferences and credibility choices made in support of a conviction, allows a rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. United States v. Harris, 293 F.3d 863, 869 (5th Cir. 2002). We review direct and circumstantial evidence adduced at trial in the light most favorable to the verdict. United States v. Sanchez, 961 F.2d 1169, 1173 (5th Cir. 1992). This court will not substitute its own credibility determination for that of the jury, but instead will look to whether the trier of fact made a rational decision. United States v. Jaramillo, 42 F.3d 920, 923 (5th Cir. 1995).

**DISCUSSION**

On appeal, De Lira-Villareal contends the government did not present sufficient evidence, direct or circumstantial, that he: (1) was aware of the illegal status of the aliens transported or (2) wilfully intended to further their illegal presence in the United States. De Lira-Villareal maintains that because the evidence gives equal or nearly equal circumstantial support to both

5

a theory of guilt and a theory of innocence, his convictions must be reversed.

Section 1324(a)(1)(A)(ii) establishes criminal liability for any person who:

knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law[.]

8 U.S.C. § 1324(a)(1)(A)(ii)(2004).  To establish a violation of § 1324(a), the government must prove that: (1) the defendant transported or moved an alien within the United States; (2) the alien was present in violation of the law; (3) the defendant was aware of the alien's status; and (4) the defendant acted wilfully in furtherance of the alien's violation of the law. United States v. Williams, 132 F.3d 1055, 1059 (5th Cir. 1998) (citing United States v. Diaz, 936 F.2d 786, 788 (5th Cir. 1991)).  The defendant's knowledge of the alien's illegal status is an essential element of the offense. Id.

In reviewing the elements for establishing a violation of § 1324(a), we first observe that there is no dispute as to the first two prongs of the inquiry, i.e., that De Lira-Villareal transported aliens within the United States or that the aliens transported were present in this country in violation of the law. Instead, we are faced with determining whether De Lira-Villareal was aware of the aliens' illegal status and whether he acted

6

wilfully in furthering their violation of the law.

**Awareness of the aliens' illegal status**

De Lira-Villareal contends the record is devoid of evidence establishing that he knew the aliens were illegally present in the United States. In support of this contention, De Lira-Villareal argues he was never told by the aliens that they were in the United States in violation of the law. Additionally, De Lira-Villareal maintains that while Agent Jalomos, an 11-year veteran of the Border Patrol, was able to determine that the passengers were illegal aliens based on their odor and appearances, there was nothing in the record to indicate that De Lira-Villareal enjoyed the same power of perception. We find De Lira-Villareal's arguments unpersuasive.

Even if De Lira-Villareal was not personally informed of the aliens' illegal status, there are other indicia of the aliens' illegal presence establishing De Lira-Villareal's knowledge. The evidence presented to the jury relating to the position of the eight aliens "crammed" into the pickup De Lira-Villareal was driving — two aliens lying on the pickup's floorboard while another lay across the laps of the four aliens seated in the back seat — and their subsequent crouching in the back seat after Agent Jalomos began following the pickup, provides strong circumstantial evidence that De Lira-Villareal had reason to know that the aliens' presence in the United States was unlawful. Also, the appearance of the

7

aliens at the time of the incident lends additional support to the jury's finding regarding De Lira-Villareal's knowledge. Evidence presented at trial established that the aliens had not had an opportunity to bathe at any time during the several days they had been traveling through the brush, and as such appeared sweaty and dirty and smelled of smoke from the campfires the group made to stay warm at night.

Whether De Lira-Villareal had actual knowledge of the aliens' illegal status, § 1324(a)(1)(A)(ii) also allows for a conviction if the defendant recklessly disregards the fact that an alien has illegally entered this country. Under the circumstances in this case and for the reasons discussed above, we conclude that De Lira-Villareal, at the very least, had a reckless disregard for the fact that the passengers he was transporting were illegal aliens.

**Acting wilfully in furtherance of the aliens' violation of the law**

De Lira-Villareal maintains he did not intend to further the unlawful presence of the aliens in the United States, but rather was simply providing persons stranded on the side of the road with vital assistance. This Circuit first examined the requirement that the defendant act wilfully in furtherance of an alien's violation of the law in United States v. Merkt, 764 F.2d 266 (5th Cir. 1985). In Merkt we announced that there must be a "'direct and substantial relationship between that transportation and its furtherance of the alien's presence in the United States.' If the defendant's act of

8

transporting an illegal alien is 'only incidentally connected to the furtherance of the violation of law,' it is 'too attenuated to come within the boundaries'" of § 1324(a). Id. at 271 (footnote and citation omitted). "Determining a criminal defendant's intent is a question of fact that the jury must resolve under the totality of the circumstances and after evaluating all of the evidence," including taking proper consideration of "the mode of transportation used, the time of travel, the route chosen, . . . and the distance from the border at the time of apprehension." Id. at 272.

The jury was presented with evidence that demonstrated a stark contrast between the story De Lira-Villareal told investigating officers as to how he first came upon the illegal aliens and the story the two deposed aliens related to authorities. Specifically, De Lira-Villareal stated that he had been approached by the group at a gas station in Realitos where he had stopped to refuel his pickup. However, it was revealed that the only gas station in Realitos had closed years before. De Lira-Villareal now maintains the evidence indicates that he actually stopped to refuel in Hebbronville, located approximately 27 miles southwest of Benavides, when he picked up the illegal aliens.[3]

---

[3] De Lira-Villareal argues that because both detained aliens stated they had been in his pickup for approximately one hour before being pulled over by Agent Jalomos, this provides support for finding that he actually stopped in Hebbronville rather than Realitos, which, as previously stated, is located only thirteen miles from Benavides.

However, both aliens retained as material witnesses indicated that De Lira-Villareal picked them up along the highway in the countryside, not at a convenience store or a gas station. In fact, Machuca-Rocha specifically stated that the group of aliens was never at a store of any kind. Therefore, while De Lira-Villareal may have actually picked up the aliens around Hebbronville (based on the amount of time the aliens stated they were passengers), the more probative evidence for purposes of our inquiry is the discord concerning the fundamental issue of where De Lira-Villareal first encountered the aliens.

De Lira-Villareal also claims there is no evidence he knew that Highway 359 was notorious for alien smuggling, arguing that he was unfamiliar with the area and thus did not have the requisite knowledge, much less the wilfulness to violate § 1324(a). De Lira-Villareal maintains he was simply trying to get to San Antonio after realizing that he did not have enough gas to travel from his starting point in Laredo to his mother's home in Mission, Texas. De Lira-Villareal suggests the fact he mistakenly told Agent Jalomos he had stopped in Realitos rather than Hebbronville provides further support for his contention that he was unfamiliar with the area.

Testimony at trial revealed that the area around Realitos and Benavides in Duval County is a common staging area or "lay-up area" where illegal aliens are guided to certain points beyond Border Patrol checkpoints to be picked up. The jury was entitled to

10

consider that De Lira-Villareal was found to be transporting illegal aliens northeastward, further into the United States and away from Border Patrol checkpoints, in a locale known for its alien smuggling. Moreover, De Lira-Villareal's chosen route of travel, a factor to be considered in determining a defendant's intent under § 1324(a), Merkt, 764 F.2d at 272, raises serious doubts as to the veracity of his story. First, if De Lira-Villareal was originally trying to get to Mission from Laredo, the most direct route is clearly along U.S. Highway 83, a four-lane divided highway for much of the way. Instead, De Lira-Villareal chose to travel due east on State Highway 359, a two-lane undivided highway. Moreover, by taking State Highway 359 instead of the U.S. Highway 83, De Lira-Villareal added an extra 36 miles and an hour and a half to his trip.[4] Assuming that De Lira-Villareal was aware of his limited resources prior to embarking on his travels to Mission, his decision to take the route he did is highly suspicious and inconsistent with the story he told Agent Jalomos.[5]

In addition, the evidence adduced at trial showed that De Lira-Villareal, while transporting the illegal aliens, drove by a

---

[4] These figures were calculated using travel planning software, which takes into consideration the fact that the two-lane, undivided highways De Lira-Villareal would have had to take on his way to Mission go directly through several small towns and other intermittent road crossings that often require drivers to reduce their travel speeds.

[5] It is unclear whether the limited resources were in the form of money or actual gasoline in the gas tank.

11

24-hour convenience store located in the town of Benavides without stopping. De Lira-Villareal argues he did not stop in Benavides because, by all accounts, it was a small town, and that he planned on taking the aliens further down the road. This is wholly inconsistent with De Lira-Villareal's contention that he was unfamiliar with the area. If De Lira-Villareal had truly not been acquainted with this part of Texas, it does not follow that he could at the same time be cognizant of the small town best equipped to provide assistance to his passengers. Although De Lira-Villareal insists that he only intended to help the aliens, the jury was certainly entitled to find that he could have stopped and obtained assistance for the aliens at the first opportunity, i.e., the convenience store in Benavides.

Finally, De Lira-Villareal argues there is no evidence that he was ever paid for transporting the illegal aliens, specifically noting that neither deposed alien reported making any type of payment to De Lira-Villareal. We have previously held, however, that financial gain is not an element of § 1324(a), United States v. Romero-Cruz, 201 F.3d 374, 379 (5th Cir. 2000), and thus De Lira-Villareal's argument fails.

In sum, the direct and circumstantial evidence presented by the government was sufficient for a rational jury to have rejected De Lira-Villareal's explanations as not credible and to have concluded that he knowingly transported illegal aliens in furtherance of their violation of the law. In Williams, this court

12

stated that "[i]t is the jury's responsibility to weigh the credibility of witnesses. That the jury chose not to believe [defendant]'s testimony is to [defendant]'s detriment. However, this court will not assume the jury's role on appeal." 132 F.3d at 1059 (finding sufficient evidence supporting the jury's finding that the defendant violated § 1324(a)). While De Lira-Villareal essentially argues that he was simply a Good Samaritan in the wrong place at the wrong time, the strength of the evidence indicating otherwise is considerable. Because we are bound to view all evidence, as well as all inferences reasonably drawn from that evidence, in the light most favorable to the government, we conclude there was legally sufficient evidence to support De Lira-Villareal's convictions.

## CONCLUSION

Having carefully reviewed the record of this case, the parties' respective briefing and arguments, and for the reasons set forth above, we conclude there was sufficient evidence to support the jury's finding that De Lira-Villareal transported illegal aliens with the requisite knowledge of their illegal status and with the wilful intent to further their violation of the law.

AFFIRMED.