# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
April 5, 2013

No. 11-41338

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

JOEL CARDENAS-MENESES,

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 7:06-CR-777-5

Before STEWART, Chief Judge, DAVIS, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Defendant-Appellant Joel Cardenas-Meneses ("Cardenas") challenges his conviction on grounds that the evidence is insufficient to support a number of his alien transporting counts and also argues that his sentence was unreasonably disproportionate as compared to the sentences received by similarly situated defendants. Finding no error, we AFFIRM for the reasons more fully set forth below.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-41338

## I.

This appeal concerns Cardenas's conviction of one count of conspiracy to transport an alien within the United States by means of a motor vehicle and to conceal and harbor an alien during which the death of nine persons occurred (Count 1) under 8 U.S.C. §§ 1324(a)(1)(A)(v)(I), 1324 (a)(1)(A)(ii), 1324 (a)(1)(A)(iii), and 1324(a)(1)(B)(iv), nine counts of transporting an alien within the United States resulting in the death of said alien (Counts 2-10) under 8 U.S.C. §§ 1324(a)(1)(A)(ii), 1324(a)(1)(A)(v)(II), and 1324(a)(1)(B)(iv), and two counts of transporting an alien within the United States for private financial gain (Counts 11-12) under 8 U.S.C. §§ 1324(a)(1)(A)(ii), 1324(a)(1)(A)(v)(II), and 1324(a)(1)(B)(i).

Count 1 alleged a conspiracy to transport aliens from a location near Hidalgo, Texas, to a location near Edinburg, Texas, by means of a motor vehicle. The conspiracy count named six co-conspirators as defendants: Victor Adrian Guerra-Flores, Norberto Garza, Hector Garza, Jorge Hernandez-Hernandez, Francisco Banda-Encinia, and Appellant Cardenas. These same defendants were also named in Counts 2-12. The charged offenses stemmed from an accident that occurred on August 9, 2004, when a vehicle being used by the Cardenas alien smuggling operation to transport a load of undocumented aliens struck the edge of a bridge and fell into a canal and filled with water, resulting in the drowning deaths of nine aliens.

The record recounts the facts surrounding Cardenas's immense alien smuggling empire in operation prior to, and at the time of, the August 9, 2004 accident. In summary, at trial Ramiro Vera testified that he worked for Cardenas for many years in the alien smuggling business. Cardenas employed Vera and at least two others to pick up and drive illegal aliens from location to location. Vera worked for Cardenas as often as every other day. Cardenas did not drive aliens himself; he gave the orders and paid the drivers. After a year of

2

No. 11-41338

working with Cardenas, Vera was introduced to Jorge Hernandez, Cardenas's "right-hand man." Vera took orders from Hernandez and over time dealt less and less with Cardenas, although he was told that if he had any problems with Hernandez he should contact Cardenas directly and he would take care of it; Cardenas always handled any problems reported to him. Vera stated that Cardenas was Hernandez's boss. He testified:  "[W]e all worked for Joel [Cardenas]," and "I knew I was working for Joel [Cardenas]. [I]f I had a problem . . . I would call him personally."[1]

Jose Antonio "Tony" Arispe testified that he also transported illegal aliens with Cardenas. While Cardenas called him at times to see how business was going and handled any issues Arispe had with trying to collect money he was owed, Arispe dealt with Hernandez about day-to-day operations. Based on this arrangement, Arispe testified that "[the person] who does less is the boss [meaning Cardenas]," and the person who does more (meaning Hernandez) has a lower rank.

Several witnesses testified about how the alien smuggling organization operated: "walkers" guided aliens across the Rio Grande River into the brush and the aliens were then picked up by a driver and brought to a stash house. On the night of August 9, 2004, Campos drove the vehicle to the pre-designated pick-up spot, honked his horn, and a large number of aliens rushed to the car and got in. Arispe testified that nineteen individuals were in the group to be picked up that night. Campos was a 17-year-old who had been drinking, had no driver's license or permit, and was driving with his headlights off. Soon after departing he hit the edge of a bridge and the vehicle fell into a canal, resulting

---

[1] We do, however, note that Vera was not involved in the August 9, 2004 accident and while he did not claim to be working for Cardenas during that period of time, he testified that he worked for Cardenas both before and after the accident.

3

in the drowning death of nine illegal aliens. Campos and only one alien-passenger survived—Nelson Ernesto Navarro-Cornejo.

Immediately following the accident, Trooper Donnie Pacheco arrived at the scene and searched the bodies for identification, placed any identification document he found on the chest of the corresponding body, and photographed the bodies. Seven victims had identification documents; two did not. Identification cards found on the deceased contained the names: Wendy Carolina Marquez-Martinez, Jose Antonio Lara, Jose Gilberto Carcamo, Delmi Noemi Garcia, Marco Antonio Tomasino (these individuals had documents indicating they were from El Salvador) and Salvador Lopez-Diaz and Ramon Arturo (these individuals had documents indicating they were from Honduras). The identities of the two individuals without identification documents were later ascertained. Trooper Pacheco contacted José Chacon at the Salvadoran consulate and forwarded him the photographs and documents. Chacon testified that he traveled to the morgue in Texas and identified the bodies based on the victims' identification documents he had received and descriptions he received from relatives of the deceased. A total of seven bodies were identified and returned to El Salvador (this included the two deceased aliens that did not have identification documents on their person).

Phone records reflect that Arispe called Hernandez immediately after the accident and that Hernandez dialed Cardenas's landline subsequent to that. The record also reflects that Hernandez called Cardenas approximately fifteen times on the day of the accident.

A few weeks after the accident, Cardenas met with Arispe and Hernandez. At the meeting, Cardenas reassured them that everything was going to be all right, that he had already sent money to the families of the victims, and that they were going to continue their operation of transporting aliens.

No. 11-41338

After a five-day jury trial, Cardenas was convicted on all counts and sentenced to 360 months on Counts 1-10 and 120 months on Counts 11-12 (to run concurrently). His Guidelines range was 168-210 months. Cardenas now appeals.

## II.

In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the defendant guilty of each element of the crime beyond a reasonable doubt. *United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002). This court's review of the sufficiency of the evidence is "highly deferential to the verdict." *Id.*

## III.

Cardenas argues that the evidence was insufficient to substantiate the allegations in Counts 2-3, 5-10, and 12. He raises three distinct arguments.

## A.

First, Cardenas argues the evidence was insufficient to substantiate the allegations in Counts 3, 5, 6, 7, 8, 9, and 10 of the indictment because there was insufficient evidence of the identities of the named victims or that the named victims were aliens.

Cardenas argues that when "the same offense is repeatedly charged, in the same indictment, with the only difference being the identity of the victim, then the named victim must be proved to withstand a double jeopardy challenge." Thus, Cardenas contends that because the Government did not establish that the identification documents found on the bodies were authentic and actually described the individual carrying it, this is inadequate to establish identity; and therefore if there is no way to connect a specific victim to a specific count, then

No. 11-41338

these counts are forbidden by double jeopardy principles.[2] Cardenas further claims that the "government could have prosecuted on seven of these counts using 'John Doe #1' theories, but chose not to—thereby assuming the burden to establish identity."

Cardenas cites no authority in support of this notion that the Government incurs an additional burden because it listed the names of the deceased in the indictment. In fact, to the contrary: "[W]hen an indictment alleges non-essential facts, the government need not prove them in order to sustain a conviction." *United States v. Robinson*, 974 F.2d 575, 578 (5th Cir. 1992).

The identity of a victim is a non-essential fact because neither the name of a transported alien nor the name of a person who died as a result of an alien transporting offense is an element of the offense; thus the Government was not required to prove beyond a reasonable doubt the correct identities of the deceased aliens. *See United States v. Robles-Vertiz*, 155 F.3d 725, 728-29 (5th Cir. 1998) (finding an alien's name was not an essential element of the offense and finding no error in amending the name in the indictment where defendant was aware of which person the government intended to identify in the

---

[2] Specifically, Cardenas argues that the only evidence that Delmi Noemi Garcia (Count 3) was among those transported and deceased was a document purporting to be an El Salvadoran identification card bearing that name was found on the body of a woman who died in the accident; that the only evidence that Marco Antonio Tomasino-Linares (Count 5) was among those transported and deceased was a document, without a photograph, that was some sort of record of entry from El Salvador found on one of the bodies; that the only evidence Wendy Carolina Marquez-Martinez (Count 6) was among the transported and deceased was an identification card found on one of the bodies; that the only evidence that Lizandro Diaz-Guevara (Count 7) was among the deceased was that Trooper Pacheco said he had a similar name (Lesandro Guevara) associated with one of the bodies; that there was no evidence that Josue Enrique Navidad (Count 8) was among those transported and deceased and that his name was never mentioned at trial except for the jury charge; that the only evidence that Ramon Arturo Brizuela-Mejia (Count 9) was among those transported and deceased was a purported birth certificate from Honduras bearing that name; and that the only evidence that Salvador Diaz-Lopez (Count 10) was among those transported and deceased was a document that looked like an identification card from Honduras.

6

indictment and the set of facts that formed the basis of the charge).[3] And even if such were required, the Government produced competent evidence of each victim's identity and also introduced photographs of each body. This evidence adequately established their identities.

The Government was, however, required to prove that each victim was an alien who has come to, entered, or remained in the United States in violation of the law and that the defendant was aware of the alien's status. *See United States v. Diaz*, 936 F.2d 786, 788 (5th Cir. 1991). The record is supported by sufficient evidence that the deceased individuals were in the United States illegally:  the jury saw photographs of nine deceased individuals; Trooper Pacheco testified about the various identification documents he found on seven of the nine deceased individuals and how he placed each document atop the body on which it was found; Chacon testified that seven of the deceased (including the two individuals that did not have identification documents on their person) were repatriated to El Salvador; and Trooper Pacheco provided testimony that he found Honduran documents on the other two victims. And the jury could certainly infer, based on the manner in which the deceased victims surreptitiously entered the country and were picked up near the border by Campos, that these individuals were aliens who were in the United States in violation of the law.[4]

---

[3] *See also United States v. Powell*, 498 F.2d 890, 892 (9th Cir. 1974) ("Nothing in the statute requires identification by name, and the names add nothing to the proof of the elements of the crime.") (citation omitted).

[4] *See, e.g., United States v. Lopez-Moreno*, 420 F.3d 420, 438 (5th Cir. 2005) (holding that various forms of circumstantial evidence, viewed together, were sufficient to prove that passengers were in the United States illegally); *United States v. Barajas-Montiel*, 185 F.3d 947, 954-55 (9th Cir. 1999) (confirming that, in light of the circumstantial evidence, the jurors could have reasonably concluded that material witnesses were illegally present in the United States); *United States v. Hernandez*, 913 F.2d 568, 570 (8th Cir. 1990) ("[T]he only reasonable inference to be drawn from the evidence was that the [transported aliens] were in the United States illegally.").

No. 11-41338

B.

Second, Cardenas argues that the evidence was insufficient to substantiate the allegation in Count 12 that he attempted to transport Teresa Lopez-Flores—an individual who did not die in the crash and was not in the vehicle at the time of the accident.[5]

While Cardenas is correct that Lopez-Flores's name was not even mentioned at trial, as discussed above, the Government is not required to prove the name of a transported alien.

Viewing all the evidence in the light most favorable to the verdict, the record supports the conclusion that other aliens were in the group to be transported by Cardenas and his co-conspirators the night of the accident, but Campos's vehicle was too small to accommodate all of them. Arispe testified nineteen aliens were in the group to be transported and that he told Campos to try to fit as many as he could in the vehicle. Further—while the name Teresa Lopez-Flores was not specifically referenced—there was testimony about the existence of a female survivor that Border Patrol had taken into custody after having "fallen behind," and there was testimony that this same female provided information later used to identify one of the unknown bodies from the accident. The testimony was sufficient for the jury to infer that Lopez-Flores was with the group Campos attempted to pick up and that he did not transport her in the vehicle only because his vehicle was too small to accommodate her. The evidence is therefore sufficient to support the conviction on this count. And, while Cardenas argues that Count 12 (Teresa Lopez-Flores) is wholly identical to Count 11 (Nelson Ernesto Navarro-Cornejo) because there was no evidence

---

[5] Again, Cardenas was charged with transporting the nine aliens who died in the accident (Counts 2-10) and with transporting, moving, or attempting to move two other aliens for financial gain (Counts 11-12).

8

No. 11-41338

Teresa Lopez-Flores was among those transported, we disagree as there was testimony distinctly applicable to each individual.[6]

C.

Third, Cardenas contends that the evidence was insufficient to substantiate the allegations in Count 2 of the indictment because the deceased individual—Jose Antonio Lara—possessed a United States work permit. Therefore, Cardenas argues, it was not a crime to transport Lara because he was legally present in the United States.

This argument is unavailing. The statute at issue prohibits the transport of an alien that has "come to, entered, *or* remains in the United States in violation of law." 8 U.S.C. § 1324(a)(1)(A)(ii) (emphasis added). Entry into the United States is unlawful when it occurs at a place "other than a designated port of entry" even if the alien has received "official authorization to come to, enter, or reside in the United States." *Id.* § 1324(a)(1)(A)(i). In *United States v. Esparza* this court held that the "government is not required to prove all three conditions. Even if the aliens had remained in the United States lawfully, Esparza still would have violated [the statute] because the record reflects that the aliens had 'come to' and 'entered' this country illegally." 882 F.2d 143, 145-46 (5th Cir. 1989).

Here Lara had a Salvadoran identity card and his body was repatriated to El Salvador. Further, the testimony presented at trial reflects that Lara and the group of aliens crossed over the Rio Grande guided by walkers affiliated with Cardenas's organization and were then taken to a pre-designated site where they were picked up by the vehicle; thus they did not enter the United States via a designated port of entry. Additionally, it would have been rational for the jury

---

[6] For example, there was testimony that a male individual survived the accident and was pulled from the canal and later hospitalized.

No. 11-41338

to conclude that if Lara were entitled to enter the United States legally, he would not have utilized this dangerous method of entry.

IV.

Finally, Cardenas argues that he received an unreasonably disproportionate sentence as compared to the sentences received by similarly situated defendants in this case.[7]

Cardenas was convicted and sentenced to 360 months on Counts 1-10 and 120 months on Counts 11-12 (to run concurrently). His Guidelines range was 168-210 months; thus his sentence was 150 months above the Guidelines range. Cardenas argues his sentence is unreasonably disproportionate as compared to his co-conspirator Hernandez—alleged to have been his direct underling—who received a sentence of 180 months.[8]

In contesting his sentence, Cardenas points mainly to 18 U.S.C. § 3553(a)(6)'s expressed purpose of "avoid[ing] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," and the fact that the trial court did not point to a single factor that was more applicable to Cardenas than it was to Hernandez.

However, in *United States v. Guillermo Balleza* this court stated that the disparity factor of § 3553(a)(6) "requires the district court to avoid only unwarranted disparities between similarly situated defendants nationwide, and it does not require the district court to avoid sentencing disparities between

---

[7] There is some dispute as to whether this sentence should be reviewed under a plain error standard or an abuse of discretion standard. At sentencing, Cardenas did not object that his sentence was disproportionate as compared to that of Hernandez, but rather lodged a generic objection "to the sentence as being procedurally and substantively unreasonable." We assume without deciding that Cardenas did preserve the error, but conclude, even under an abuse of discretion standard, that the district court did not err.

[8] Cardenas also points out that these individuals received the following sentences: Jose Antonio Arispe –100 months (reduced to 68 months); Norberto Garza–58 months (reduced to 38 months); Armando Campos–never prosecuted. His brief, however, focuses mainly on the disparity between his sentence and that of Hernandez.

co-defendants who might not be similarly situated." 613 F.3d 432, 435 (5th Cir. 2010).[9]

>   Here the district court made the following comments at sentencing:

>   [M]y belief is that [Appellant Cardenas] was at the top of this organization, at the pinnacle of it, that he reported to no one. He profited handsomely from this organization and it ran very well without much interruption. There were a few times I think incidents happened, but even after these deaths it kept going. It stopped for a few months and then picked right back up with the alien smuggling.

Further, the district court specifically made reference to many of the § 3553(a) factors including: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to reflect the seriousness of the offense; and (4) the need for the sentence imposed to afford adequate deterrence.

The record supports the conclusion that Cardenas was at the top of the chain of command in the alien smuggling operation:  he handled any disputes that came up and issued payments when conflicts over money arose; the testimony of Vera and Arispe characterized him as the boss of the organization; phone records reflect that he was contacted by Hernandez numerous times following the accident; he sent money to the families of the deceased after the accident; and he continued the work of his alien smuggling operation following the accident.

We are satisfied that because Cardenas was at the top of the chain of command, he was not "similarly situated" to Hernandez and other defendants, and the sentence he received was not unreasonably disproportionate.

---

[9] *See also United States v. Candia*, 454 F.3d 468, 476 (5th Cir. 2006) ("Only *unwarranted* disparities are among the § 3553(a) sentencing factors.") (emphasis in original).

No. 11-41338

V.

For the reasons more fully set forth above, Cardenas's conviction and sentence are AFFIRMED.